Foley, Executrix, Appellant, *v.* The Pittsburgh-
Des Moines Company et al.

Argued April 20, 1949.  Before MAXEY, C. J., DREW, LINN, STERN, PATTERSON, STEARNE and JONES, JJ.

*Ella Graubart*, with her *Richard B. Tucker, Jr.*, and *Patterson, Crawford, Arensberg & Dunn*, for appellant.

*Carl E. Glock*, with him *James R. Orr, John W. Wishart, Harold E. McCamey, Dickie, Robinson & McCamey* and *Reed, Smith, Shaw & McClay*, for appellees.

*James D. Porter, Clifford R. Procter* and *Roger D. McIntyre*, submitted a brief for A. O. Smith Corporation, amicus curiæ.

OPINION BY MR. JUSTICE HORACE STERN, September 26, 1949:

This action arises out of a grave disaster which took place in the City of Cleveland, Ohio, on October 20, 1944. Leakages occurred in a tank of the East Ohio Gas Company containing liquefied natural gas of a temperature of between 250 and 260 degrees below zero Fahrenheit; the tank collapsed, the liquid gas flowed out in all directions and became ignited, with the result that over a hundred persons lost their lives and some 231 separate suits for damages have been brought in Ohio and Pennsylvania, both in State and Federal courts, against the present and other defendants, most of them by widows of employes of the East Ohio Gas Company who were burned to death in the tragedy. Among the victims was Michael J. Foley, and the present action was instituted by his widow, Florence V. Foley, executrix of his estate, under the so-called Wrongful Death Statutes of the State of Ohio, for the benefit of herself and their three minor children, against Pittsburgh-Des Moines Company and Pittsburgh-Des Moines Steel Company, the manufacturers and installers of the tank, alleging negli-

gence on their part in its design and construction and in the selection of the materials of which it was built. Plaintiff recovered a verdict in the Court of Common Pleas of Allegheny County of $50,000; the court en banc overruled a motion of defendants for a new trial but granted their motion for judgment n. o. v. Plaintiff now appeals from that decision.

The East Ohio Gas Company is a public utility distributing natural gas for industrial and domestic purposes in the City of Cleveland. Its problem was to acquire facilities for the storage of gas in sufficient quantity to meet the peak demand for it in the winter months. There was an experimental plant in West Virginia which liquefied natural gas under a patented process by which ammonia was cooled by water, ethylene by the ammonia, and the raw gas by the ethylene; the advantage of such liquefaction was that 600 cubic feet of the gas could be reduced to one cubic foot of liquid and therefore be stored in one-six hundredth of the space; as and when needed it could be regasified for distribution and use. At this plant there had been built a small storage tank, cylindrical in shape, consisting of two shells, one within the other, with cork insulation between, operating somewhat on the principle of a thermos bottle. In 1940 the East Ohio Gas Company entered into a contract with the Gas Machinery Company, a Cleveland concern which owned the liquefaction patents and was engaged in the manufacture and installation of gas machinery equipment, for the erection of a liquefaction, storage and regasification plant at the East Ohio Gas Company's No. 2 works located on a ten acre tract in an industrial section of the City of Cleveland. The Gas Machinery Company sublet different parts of the project, giving a contract for the erection of three storage tanks to the Pittsburgh-Des Moines Steel Company, the defendant partnership, which had been engaged for many years in the business

of building tanks and other large works of steel fabrication. As this was the first time an attempt was being made to store liquid gas on such a large scale for commercial use the Pittsburgh-Des Moines Steel Company consulted with one H. C. Cooper, who had designed the West Virginia plant and who will be referred to more at length hereafter, and, as a result of a combination of his ideas with theirs, they had the tanks built, spherical in form, by the Pittsburgh-Des Moines Company, the defendant corporation, which, as will subsequently appear, was an entity identical, for all practical purposes, with their own partnership.

After these three tanks had been erected, put into operation and found to be satisfactory, it was discovered by the East Ohio Gas Company in 1942 that additional storage capacity was needed to take care of the city's requirements. Accordingly it entered into negotiations with defendants for the construction of a fourth tank which could store 100,000,000 cubic feet of natural gas,—twice the amount of each of the spherical tanks. Defendants offered to build such a tank based either on the model of the three former ones or on a vertical, cylindrical design with a toro-segmental bottom; they advised the East Ohio Gas Company that they were confident a cylindrical, toro-segmental-bottom tank would prove just as satisfactory as the spherical tanks and that it should be preferred because of a saving in cost. The East Ohio Gas Company thereupon entered into a contract with the Gas Machinery Company for such a tank and the latter in turn sub-contracted its construction to defendants. It was fabricated at Neville Island, Pittsburgh, by the defendant corporation and erected under the supervision of the construction engineer of the defendant partnership. Its outer shell was 51 feet high with a diameter of 76 feet, its inner shell 43 feet high with a diameter of 70 feet; the inner shell was built of $3\frac{1}{2}\%$ nickel steel, the outer of ordinary

carbon steel. Finding it difficult to obtain cork, which had been used as the insulating material between the inner and outer shells of the three spherical tanks, defendants employed rock wool for that purpose. After the tank was erected it was subjected to certain tests; later a crack developed which was repaired, and the tank was finally ready for operation in September, 1943; from time to time some defects appeared and certain additional repairs and installations were made.

The day before the accident three of the tanks, including No. 4, had been filled to their normal capacity for the anticipated winter demands, the remaining tank was being similarly filled, and the employes of the East Ohio Gas Company were starting to close down the liquefaction operation; this was a more or less routine procedure, consisting of withdrawing from the system the ethylene and ammonia, shutting down the engines, and stopping the flow of gas. According to plaintiff's testimony everything was proceeding smoothly throughout the plant. At about 2.40 o'clock in the afternoon of October 20th a witness in a building across an open field suddenly saw the No. 4 tank burst and liquid squirt out from it, apparently under pressure, at a point about ten feet above the retaining dike which had been constructed around its base. At first there were two streams that thus emerged, later there were seven or eight of them, and then the entire mass of the tank seemed to give way. There was testimony to the effect that no noise of any kind was heard, other testimony that there was a distant rumbling, while one person said there was a sound as of falling steel. Several eye-witnesses testified that they saw streams of liquid coming out of breaks in the lower half of the tank and that the entire tank apparently collapsed after being enveloped in a cloud of vapor which instantly ignited. Fire spread over the entire area, the destruction of sur-

rounding property was enormous, and the great loss of life that ensued has already been mentioned.

The problem in the case now presented is whether defendants were factually responsible, and, if so, legally liable, to plaintiff for the consequences of this accident. Its solution requires consideration of several subordinate questions: (1) By the law of what State is defendants' liability to be determined? (2) Was the evidence sufficient to establish negligence on the part of defendants? (3) Was the evidence sufficient to warrant a conclusion that such negligence was the cause of the accident? (4) Was defendants' negligence superseded by any independent, intervening cause? (5) If the accident was the result of defendants' negligence are they legally responsible therefor to this plaintiff? (6) Does liability extend to *all* of the defendants in this action? (7) Is plaintiff's right of recovery barred by the Statute of Limitations?

We proceed to consider these questions in the order named.

1. By the law of what State is defendants' liability to be determined?

To this question there can be but one answer,—an answer as to which all parties are in accord. The law of the place where the injury was sustained—the lex loci delicti—determines whether a right of action exists: Restatement, Conflict of Laws, §§378, 383, 391; *Rosenzweig, Administratrix, v. Heller*, 302 Pa. 279, 153 A. 346; *Dickinson, Administratrix, v. Jones*, 309 Pa. 256, 163 A. 516; *Mackey v. Robertson*, 328 Pa. 504, 195 A. 870; *Sudol v. Gorga*, 346 Pa. 463, 31 A. 2d 119. It is that law which prescribes the standard of care that the person charged with the commission of the tort must observe; on the other hand, the law of the forum—the lex fori—governs the application of such standard to the facts in accordance with its own rules of evidence and the inferences to be drawn therefrom: Restatement, Conflict of Laws, §§380(1); 383, comment b; 595 and

comment b; *Tobin v. Pennsylvania R. R. Co.*, 100 F. 2d 435, 436. The law of the forum also controls all questions as to burden of proof and whether there is sufficient evidence of negligence and proximate causation to entitle the plaintiff to have the case submitted to the jury: Restatement, Conflict of Laws, §595, comments a and b; *Singer, Administratrix, v. Messina*, 312 Pa. 129, 167 A. 583; *Sudol v. Gorga*, 346 Pa. 463, 465, 466, 31 A. 2d 119, 120; *O'Hagan v. Byron*, 153 Pa. Superior Ct. 372, 33 A. 2d 779; *Carroll v. Godding*, 155 Pa. Superior Ct. 490, 38 A. 2d 720; *Tobin v. Pennsylvania R. R. Co.*, 100 F. 2d 435, 436. As to the Statute of Limitations, a suit on a cause of action created by a statute which limits the time in which an action may be brought must be started within that time, but if the law of the forum provides a shorter period the action must be brought within the period thus prescribed: Goodrich on Conflict of Laws, p. 171, §86; Wharton on Conflict of Laws, Vol. 2, 3d ed., p. 1264; Restatement, Conflict of Laws, §603 and comment a; *Rosenzweig, Administratrix, v. Heller*, 302 Pa. 279, 281, 282, 153 A. 346.

2. Was the evidence sufficient to establish negligence on the part of defendants?

The negligence alleged in plaintiff's statement of claim and which she sought to establish at the trial was in regard to (a) the design and construction of the tank, (b) the selection of the materials of which it was built, and (c) the adequacy of the tests made to determine its safety. In considering whether such negligence was proved to a point justifying the presentation of her case to the jury it must be borne in mind that, as she rightly contends, where there is constructed a uniquely dangerous, highly hazardous instrumentality, the law imposes the duty of exercising a correspondingly high degree of care on the part of those creating a structure which involves such potential perils. It was said in *MacDougall v. Pennsylvania Power & Light Co.*, 311 Pa. 387, 396,

166 A. 589, 592: "Vigilance must always be commensurate with danger. A high degree of danger always calls for a high degree of care. The care to be exercised in a particular case must always be proportionate to the seriousness of the consequences which are reasonably to be anticipated as a result of the conduct in question",—a statement quoted with approval in the more recent case of *Maize, Administrator, v. Atlantic Refining Co.*, 352 Pa. 51, 56, 57, 41 A. 2d 850, 853.

(a) The charge of negligence in regard to the design adopted for the construction of tank No. 4 is based upon the contention that, instead of the spherical tanks which had proved satisfactory and involved no unusual problems of safety, defendants built a cylindrical tank with a toro-segmental bottom—a bottom resembling a shallow circular dish with a trough around it—which was not only a highly experimental, practically untried type of construction, but inevitably carried within it the seeds of the disaster which eventually occurred, and that their motive in ignoring the grave risk thereby involved was the mere desire to economize space and money, it appearing that a tank of this tremendous capacity would occupy less room than two additional spherical tanks and, since it required less steel, would effect a saving in the cost. The principal features of the design which are the subjects of plaintiff's attack are (1) the cylindrical form of the tank, which necessarily involved an almost right angle joint (approximately 116°) between the upright walls and the bottom; (2) the resting of the inner shell upon two concentric circles of movable wooden supports, a device which had not theretofore been used in such construction and which, plaintiff claims, made the entire structure potentially unsafe; (3) the fact that the tank was not bolted or anchored to the concrete foundation but rested thereon solely by its own weight; and (4) the fact that there was a single instead of a double welding of the rim girder which

formed the lower face of the vertical wall to the curved bottom plate of the inner shell. How these alleged deficiencies functioned, according to plaintiff's testimony, as causative factors in the happenings of the accident will be discussed hereafter; what is to be noted at this point is plaintiff's charge that not only in the respects enumerated the design and construction of the tank were faulty but that all such defects were negligently disregarded and questions of safety relegated to the background in order to accomplish the objectives hereinbefore stated; she charges that inadequate studies were made concerning the secondary stresses and strains involved in a tank having twice the capacity of each of the spherical tanks and differing radically from them in design, and she places special emphasis upon the fact that, as this was an innovation—the first huge tank of its kind for the purpose intended—the novelty of its construction and the experimental nature of the undertaking called all the more loudly for an extraordinary degree of care. It is true that defendants produced considerable testimony to the effect not only that some of plaintiff's alleged facts were untrue but that even if subsequent events proved that the defects she pointed out really existed they were not the result of any negligence on their part because the type of tank had been determined upon by them only after earnest consideration and consultation with expert advisers. This testimony, however, being oral, was for the consideration of the jury, and it was that tribunal which was properly charged with the responsibility of deciding whether the criticisms advanced by plaintiff were warranted, whether the alleged deficiencies were such that defendants should have realized that they involved potential danger, whether they were too lightly brushed aside, and whether the final form given to the tank was adopted without the sufficient care and caution which the situation demanded, or whether, on the other hand, defend-

ants' testimony in regard to all these matters exonerated them from the charge of negligence.

(b) Plaintiff's complaints concerning the kind of materials selected for the construction of the tank relate principally to the rock wool used as the insulating medium between the two shells and to the type of steel used in building the inner shell. The purpose of the insulation was to prevent any boiling and evaporation of the liquid gas in the inner tank; the purpose of the outer shell was merely to keep the insulating material in place. It appears that in the case of the three spherical tanks defendants had used granulated cork as the insulating material, but, because of alleged wartime difficulties in obtaining such cork at the time when the No. 4 tank was being built, defendants substituted rock wool; this, unlike the cork, proved unsatisfactory because it constantly kept settling, with the result that frost spots appeared from time to time on the sides and bottom of the tank and frequent re-fills of the rock wool had to be made. But it is not necessary to give further consideration to this particular matter because the testimony presented at the trial did not establish that the unsuitableness of the rock wool had any causal relation to the happening of the accident.

With regard to the steel, however, the situation is different, because plaintiff did produce evidence to prove not only that the steel used for the inner tank was defective from the standpoint of safety, but that it was this defect which was one of the principal causes of the leakages from the tank and the consequences that followed. Defendants had used for the inner shell an alloy of $3\frac{1}{2}\%$ nickel steel. It seems that when ordinary steel is exposed to liquid gas of such an enormously cold temperature it becomes embrittled, so that the only kind of steel that can be used for the purpose is one that will, under such conditions, remain sufficiently ductile to avoid cracking and rupturing. To determine whether it

can stand up under such exposure it is allegedly necessary to submit it to a so-called Charpy impact test, and unless it rates in that test a minimum of 10 ft. lbs. it is definitely unsatisfactory for use in a tank containing liquid gas. Defendants' chief engineer himself, in applying for certain patents, stated that in any structure in which steel would be exposed to such exceedingly low temperatures it would fail, crack and rupture if it had not proved itself in such a test. Plaintiff's testimony showed that the steel of which the three spherical tanks were built had a Charpy impact test of only from 2 to 4 ft. lbs., a fact that had apparently been called to defendants' attention at the time; nevertheless they used the same kind of steel for the No. 4 tank without making any further tests or experiments to determine its suitability for a structure of this new design, but relied merely upon the fact that there had been no trouble up to that time with the steel used in the spherical tanks. The Carnegie-Illinois Steel Company, from which the steel for the No. 4 tank was purchased, expressly notified defendants that it was for them to conduct any impact tests that might be required, and that responsibility for performance of the steel in service rested solely with them. Shortly after the erection of the tank, and while it was being cooled preparatory to being put into operation, a crack from 3 to 4 feet long developed in the bottom as soon as the first liquid was allowed to run in. Defendants claimed that this was due, not to any defect in the structure or material, but to the allegedly improper manner in which the East Ohio Gas Company conducted the cooling process in not cooling the tank slowly and uniformly around its entire circumference, with the result that, as the cold liquid ran around the bottom and came to where the steel had not been cooled, the contraction of the hot plates caused them to pull and tear. Defendants took out the part where the crack occurred and replaced it with another section, and apparently

there was no further trouble at that point prior to the final accident. Defendants contended that the steel used by them in the construction of the inner shell was entirely proper even though it did not measure up to a satisfactory Charpy test; they claimed that tests originally made by Mr. Cooper in connection with the plant in West Virginia had shown that $3\frac{1}{2}\%$ nickel steel could satisfactorily be used as a container for liquid natural gas. The question thus became one for the jury as to whether defendants did use a suitable steel, and, if not, whether their failure to do so was the result, not of a mere error of judgment on their part, but of negligence in failing to realize the seriousness of the problem and properly to cope with it.

(c) Plaintiff charged defendants with negligence in failing to make adequate tests of the safety of the tank in view of the troubles that occasionally occurred, such as the initial crack in the bottom of the tank and the frost spots that appeared from time to time, and especially because of the great dangers involved in the structure and the novelty of its design. After the tank had been erected it was initially subjected to a load test under the supervision of defendants' construction engineer; the inner shell was filled with water to a height of 16 feet and a weight of 2100 tons, which was somewhat in excess of the anticipated weight of the liquid gas to be stored therein, and with a certain amount of air pressure applied to the top of the water; the seams were tested with soapsuds in order to spot holes in the welds, after which the welders made the necessary re-welds, and there was a re-test after the seams had been made tight. Plaintiff contends, however, that other tests should have been employed in order to determine how the steel that was being used would stand up under the extremely low temperature of the liquid gas, and to what extent the pressure would cause dangerous stresses, strains and possible ruptures in a tank of that design.

Having in mind all the circumstances, as well as the obligation of extreme care imposed upon defendants by reason of the dangerous nature of the structure and its lethal contents, it was a question for the jury whether reasonably sufficient tests were made, and plaintiff was entitled to have her case submitted to that tribunal on the basis of the evidence she presented. It is said in Restatement, Torts, No. 395, comment c, that "The particulars in which reasonable care is usually necessary for protection of those whose safety depends upon the character of chattels are, (1) the adoption of a formula or plan which, if properly followed, will produce an article safe for the use for which it is sold, (2) the selection of material and parts to be incorporated in the finished article, (3) the fabrication of the article by every member of the operative staff no matter how high or low his position therein, (4) making such inspections and tests during the course of manufacture and after the article is completed as the manufacturer should recognize as reasonably necessary to secure the production of a safe article, . . . . Where . . . there is danger of serious bodily harm or death unless the article is substantially perfect, it is reasonable to require the manufacturer to exercise almost meticulous precautions in all of these particulars in order to secure substantial perfection."

Defendants produced considerable testimony to the effect that the tank was designed and the material selected, not by themselves alone, but in cooperation with representatives of the East Ohio Gas Company, and that that company participated to some extent in the testing of the tank before accepting it; more particularly they pointed out that one of their principal advisers was Mr. H. C. Cooper. The exact status of Mr. Cooper is a matter of controversy in the testimony. It appears that he was in retirement at the time but had formerly been president of the Hope Natural Gas Company,

which, like the East Ohio Gas Company, was a subsidiary of the Standard Oil Company of New Jersey; it appears also, however, that he was on the payroll, for some purposes at least, of defendants. Cooper had conducted experimental work in West Virginia in the process of liquefying and storing natural gas and had operated a pilot plant there; he had discussed the three spherical tanks with the defendants before they were built, and he was admittedly an experienced natural gas engineer although not a tank builder. Just to what extent he had anything to do with the final design and construction of the No. 4 tank and to what extent his ideas in regard thereto were accepted by defendants were matters in dispute. It was testified that the East Ohio Gas Company were gas operators and not tank builders, that they had no knowledge of the technical requirements of a storage tank under the conditions of their plant operation, that they were not familiar with Charpy impact tests of steel or anything of that kind, that they relied wholly on defendants in connection with everything concerning the construction and installation of the tanks and followed their recommendations in all respects, and that all alterations or additions were made by them only after consultation with defendants and under their direction. However, this is all unimportant in view of the fact that the extent to which the East Ohio Gas Company may have been involved in responsibility for the design of the tank or the material employed could serve only to impose possible liability upon that company also; it would not affect the liability of defendants, since plaintiff would have a cause of action against both parties if both were responsible.

    3. Was the evidence sufficient to warrant a conclusion that defendants' negligence was the cause of the accident?

In order to prove that defendants' negligence in the respects hereinbefore discussed was not only a cause,

but the sole cause, of the accident, plaintiff relied upon one Walter Samans, a civil and mechanical engineer with extensive experience in the design of all kinds of tanks, who testified as an expert. Expert opinion as to the cause of an accident is always admissible where the facts depend upon circumstantial rather than direct evidence. Thus in *Walbert v. Trexler*, 156 Pa. 112, 27 A. 65, the alleged negligence was in the use of a leaky boiler; opinion evidence was received that such use was imprudent and that in fair probability an explosion which occurred was caused by the leak; whether the testimony of the expert witness was convincing was held to be a matter for the jury. In *Muller v. Kirschbaum Co.*, 298 Pa. 560, 148 A. 851, a coffee urn exploded in a cafeteria; a practical engineer was allowed to express an opinion that the urn had not been properly constructed, that its outer shell could not safely stand a strain of more than one-third of that which passed from the boiler to the coils through the steam pipe, that a reducing valve which was lacking to the urn was essential to a safe operation, and that the adoption of any plan other than the use of such a reducing valve constituted a risk which made a resulting accident likely; it was held that this opinion was properly submitted to the jury for their consideration. In *Lott v. Peoples Natural Gas Co.*, 324 Pa. 517, 527, 188 A. 582, 586, it was held that the testimony of expert witnesses who gave their opinions as to the cause of the lashing, bending and breaking of a pipe was properly received in evidence because a layman could not be expected to know or fully appreciate the laws of mechanics governing the problem involved; it was said that "Questions as to the elastic limit of steel, the tensile strength of the pipe, the pressure that, in order to bend or break it, would have to be exerted at a given point by a given force acting in a given direction and at a given distance, and the principles appertaining to leverage and fulcrums, are matters requiring technical

knowledge and experience beyond the range of those who have not made them the subject of special study. The fact that the opinions are in reference to the ultimate issue to be decided by the jury does not bar them if otherwise admissible." Similarly, in *Ebbert v. Philadelphia Electric Co.,* 330 Pa. 257, 198 A. 323, and *Saganowich v. Hachikian,* 348 Pa. 313, 35 A. 2d 343, expert opinion evidence as to the imperfections of a machine, why it did not work properly, and how the accident was caused, was held to be properly received and for the consideration of the jury.

Samans testified that the sharp angulation of the connection between the vertical sides of the inner shell and the toro-segmental bottom made the structure a potentially dangerous one. It was his opinion that spherical curvature was required in the case of a vessel intended for the storage of a large quantity of liquid of great weight, the advantage of a continuous curvature being that it prevents the concentration of stresses at any one point; one of defendants' witnesses admitted that the secondary stresses in a spherical tank are of a different nature than those in a cylindrical one. Samans further testified that due to the weakness in that angular attachment and in the metal adjacent to it there had been, in his opinion, a drawing out of the steel, with a resulting "ductile break" in the bottom of the inner shell and the consequent starting of a leak; this was followed, because of embrittlement of the metal, by a whole series of breaks around the attachment; the leaking liquid rapidly filled the insulation space between the inner and outer shells to a point sufficiently high above the place whence it emerged to eject it under great pressure and with considerable force through the outer shell, which, not being designed to contain the liquid gas but only to hold the insulation material in place, had been built of ordinary carbon steel; the pressure of the liquid in the insulation area caused the bulged bottom of the

outer shell to be pulled off the concrete foundation to which it was not bolted or anchored as it should have been, whereupon the movable wooden posts supporting the inner shell tripped inward, fell over, and thereby allowed the entire inner tank to drop through the three feet of rock wool insulation and crash to the bottom of the outer shell, the brittle steel shattering and breaking into a multitude of fragments (about 2400 of them were later counted) which floated off on the liquid in all directions and to considerable distances. Plaintiff contends that this theory of her expert witness is supported both by the facts observed at the time of the happening of the accident and by those revealed in subsequent investigations; she stresses particularly the fact that no noise of any kind, except at most a "distant rumbling", was heard by anyone preceding the appearance of the leaking liquid and its vaporization and ignition, while one of her witnesses testified to a sound like the falling of steel plates, which plaintiff attributes to the crashing of the inner tank on the bottom of the outer shell. It is clear that the testimony of Mr. Samans, reinforced as the jury may have believed it to be by such other evidence, was sufficient to require the submission to the jury of the question whether the accident did in fact so happen. All that the law requires in such cases is that the evidence be such as to satisfy a reasonable and well-balanced mind; it is not necessary that a plaintiff be able to prove the cause of the accident by direct evidence, it being sufficient if the testimony supports inferences which may reasonably be drawn by the jury.

Defendants attempted to establish that the accident was due to operative causes for which, not they, but the East Ohio Gas Company was responsible,—more particularly that it was the result of an explosion and not of an initial leakage from the tank. By a number of expert witnesses they advanced several theories as to how such an explosion could have occurred. After the

No. 4 tank had cracked on its first test the East Ohio Gas Company built around it a retaining wall or dike; they claim that they did this with the knowledge and approval of defendants; its purpose was to catch the liquid from the tank if a leak should develop and allow it to flow off through a conduit into a pit known as No. 8 pit which was covered with a metal roof and would serve as an overflow sump in case of such a leak. When frost spots developed defendants attributed this to an interference by the dike with the ventilation under the tank and they suggested to the East Ohio Gas Company that an electric blower be installed beside the tank in order to circulate warm air under the bottom when necessary to melt the ice that would form there; the East Ohio Gas Company installed such a blower but, in the opinion of defendants, placed it too close to the dike, and one of defendants' theories was that an explosion may have been started by a spark from this blower, either from the electricity used to drive it or from static electricity generated in the blower itself. Another theory of defendants was that an explosion may have occurred in No. 8 pit, originating in the electric mechanism of a motor (which they claimed had been installed there in connection with a pump) and communicated through the ducts which connected all of the tanks with this pit. Still another possibility suggested by them was based upon testimony that after the accident there was discovered a flame burning from a hole in a copper vent pipe located in back of one of the spherical tanks and running from a manifold, which fed all four tanks, to the so-called "ice box" where the cooling and liquefying process was in part conducted; this hole was described as being 1 to 1½ inches by 3 to 4 inches in dimension and the pipe was said to be corroded; it was defendants' theory that the leaking gas may have followed along this pipe beneath the insulation and in that manner may have have come inside the dike of the No. 4 tank or it may

have escaped and ignited or exploded behind that tank. Defendants also advanced the supposition that two employes of the East Ohio Gas Company who had crawled under the No. 4 tank some time before the accident and had dragged out from there a steam hose in order to thaw out a frozen valve may have allowed the hose to catch on one of the frail steel gas pipes installed under the tank and break it off; the opening of the door of the dike may have created a spark which ignited and exploded gas underneath the tank, or such ignition may have occurred from their use of a flashlight. Still another possibility they suggested was based upon testimony that on the morning of the day of the accident the vapor pressure on top of the liquid was recorded in the official daily log at the plant as being much below the normal, and such reduction in pressure may have caused the liquid to boil and bump, with an ultimate rupture of the tank. In support of their theory of an explosion defendants claimed that on the morning of the accident there were strong gas fumes in and about the plant and that the initial seat of the trouble may have been due to some act of omission or commission on the part of the employes, as, for example, in the manner of manipulating the valves or other equipment controlling the pressures. As pointing to an explosion they also relied largely upon the wide scattering of the pieces of the inner tank which were subsequently found and collected.

All of the theories thus advanced by defendants were scouted by plaintiff on the ground either that they were based on facts alleged by defendants' own witnesses but denied by those of plaintiff and which must therefore be eliminated from the court's consideration in acting upon a motion for judgment n. o. v., or that they rested on assumptions of facts not supported by any evidence at all. Thus plaintiff pointed out that the dike was 10 feet distant from the No. 4 tank and was there-

fore not near enough to be the cause of any trouble; that there was no motor in the bottom of No. 8 pit, and no gas there immediately preceding the accident which could have furnished material for an explosion, and that the air-tight cover of riveted steel on the top of the pit was intact and in place at the time when the vapor from the leaking tank filled the air, showing that there could not have been an explosion in the pit; that there was no hole and no leak in the vent pipe previous to the occurrence of the accident, and indeed, since this vent line was connected with all four tanks, if there had been a hole and leaking gas therefrom all four tanks would have been affected and tanks No. 1 and No. 2 would not have been left standing, as they were, after the accident, still filled with their contents of liquid gas; that there was no basis whatever for the allegation that East Ohio Gas Company employes crawling under the No. 4 tank had broken off one of the gas pipes installed there; that it was not true that there was anything wrong with the vapor pressure on the day of the accident but that the written entries on the plant log in that respect were an obvious error, the pressure in all four tanks being normal; that on the day of the happening of the accident everything was operating smoothly, efficiently and normally and there was no smell of gas whatever around the plant or anything wrong with the operation of the valves; that the same pipes, engines and other equipment served all four tanks but nothing happened to the three spheres, only the No. 4 tank being ruptured; that, while the East Ohio Gas Company had repaired the plant from time to time and replaced worn and deteriorated parts, all the repairs and replacements were minor in character and were not shown to have had any connection whatever with the happening of the accident. Plaintiff contends that if there had been any explosion of the magnitude necessary to produce such a holocaust the noise would

have been plainly heard and at great distances, but such was not the case, and plaintiff also points out that the top of the outer shell of the tank was later discovered almost in one piece, indicating that there was no explosive force working upwards and outwards, and that the rupture discs and vacuum discs were found *pulled in* after the accident, showing an inward suction caused by the escape of the liquid from the bottom of the tank rather than an upward pressure such as would be caused by an explosion. Thus, while defendants attempted to suggest many possible causes to which the accident could be attributed, it is clear that if the jury rejected their version of the facts, as, of course, it had a right to do, their theories as to the cause of the accident would automatically fall, while if the jury believed the testimony of plaintiff's witnesses, as presumably it did, it could well conclude that that testimony supported the version of the accident advanced by Mr. Samans, namely, that it was due solely to the improper design and construction of the tank and the negligent use by defendants of steel which was inadequate for the function it was called upon to perform. It is true that where, of several theories advanced for the cause of an accident, one is as plausible as the other *and equally consistent with the factual testimony,* so that the verdict would necessarily be a mere guess as to the real cause, no recovery can be allowed: *Sandt v. North Wales Foundry Co.,* 214 Pa. 215, 63 A. 596; *Houston v. Republican Athletic Association,* 343 Pa. 218, 220, 221, 22 A. 2d 715, 716; *Henderson v. National Drug Co.,* 343 Pa. 601, 613, 23 A. 2d 743, 749; *Fix v. Pennsylvania Power & Light Co.,* 346 Pa. 598, 601, 31 A. 2d 114, 116. Likewise it is true that where an injury may be the result of one of several causes for only one of which defendant is liable, the burden is on the plaintiff to individuate that one as the proximate cause of his injury and to exclude other causes *fairly suggested by the evidence* to which it would be *equally*

*reasonable* to attribute the injury: *Lott v. Peoples Natural Gas Co.*, 324 Pa. 517, 526, 188 A. 582, 585. But on the other hand, where the evidence points to a certain cause which would make the defendant liable the plaintiff will not be denied redress merely because there may be some other *possible* cause for the accident; in such a case the question is for the jury: *DeNardo v. Stephens-Jackson Co.*, 261 Pa. 230, 233, 104 A. 584, 585. Proofs to a degree of absolute certainty are rarely attainable; it is sufficient if they are such as to satisfy a reasonable mind; the law does not require the elimination of every *possible* cause of the accident other than that on which the plaintiff relies, but only such other causes, if any, *as fairly arise from the evidence*: *Giordano v. Clement Martin, Inc.*, 347 Pa. 61, 64, 31 A. 2d 504, 506; *Saganowich v. Hachikian*, 348 Pa. 313, 316, 35 A. 2d 343, 345; *Liguori, Administrator, v. Philadelphia*, 351 Pa. 494, 498, 41 A. 2d 563, 565; *Van Tine v. Cornelius, Administrator*, 355 Pa. 584, 588, 50 A. 2d 299, 301; *Fidelity-Philadelphia Trust Co., Executor v. Staats*, 358 Pa. 344, 348, 57 A. 2d 830, 832. The testimony need not exclude everything which the ingenuity of counsel may suggest as having *possibly* caused or contributed to the injury: *Rozumailski v. Philadelphia Coca-Cola Bottling Co.*, 296 Pa. 114, 119, 145 A. 700, 701; *Lott v. Peoples Natural Gas Co.*, 324 Pa. 517, 526, 188 A. 582, 585; *Ebbert v. Philadelphia Electric Co.*, 330 Pa. 257, 261, 262, 198 A. 323, 326; *Straight, Administratrix, v. B. F. Goodrich Co.*, 354 Pa. 391, 396, 47 A. 2d 605, 607, 608. All that a plaintiff is required to do is to prove, to the satisfaction of the court and jury, that the act or neglect of the defendant was the proximate cause of the injury; if he does this he can recover, even though the evidence to sustain his burden of proof does not absolutely exclude every possibility other than the one sought to be established: *King v. Equitable Gas Co.*, 307 Pa. 287, 294, 161 A. 65, 66.

4. Was defendants' negligence superseded by any independent, intervening cause?

Defendants claim that the failure of the East Ohio Gas Company to inspect the tank and make further tests of its safety constituted an independent act of negligence which superseded their own negligence. There is no merit in this contention. Whether the East Ohio Gas Company was under a duty of making more adequate inspection and tests, or whether in view of its position as a gas operator and not a tank builder it could not have been expected to have the technical knowledge necessary to perform such a duty, might, if it were a defendant, be a question for the jury. But even if such a duty existed and the East Ohio Gas Company failed to perform it, that would not free defendants from blame, for any such shortcoming on the part of the East Ohio Gas Company would not constitute an intervening and superseding act of negligence. In Restatement, Torts, §396, it is said that "A manufacturer of a chattel is subject to liability under the rules stated in §§394 and 395, although the dangerous character or condition of the chattel is discoverable by an inspection which the vendor or any other person is under a duty to the person injured to make." All academic authorities on the law of torts (Harper on Torts, ch. 7, p. 248, §106; Prosser on Torts, ch. 15, p. 687; §83; Bohlen, Studies in the Law of Torts, ch. 2, pp. 117, 118) agree that a manufacturer is not relieved of liability for the negligent construction of an article which, in its defective condition, menaces the safety of others, merely because his immediate vendee or some other person through whose hands the article passes has the opportunity, or is even under a duty, of inspection. This is because the failure of such vendee or other person to make an inspection is within the foreseeable risk of the manufacturer. It is said in Harper on Torts, ch. 7, p. 248, §106: "A negligent defendant can not escape liability because of a failure

on the part of some third person to perform an affirmative duty which, if properly performed, would have enabled the plaintiff to avoid the risk created by the defendant's negligence. The failure of the other to inspect adequately may make him liable to the party harmed, but it will not relieve the defendant whose negligence was responsible for the hazard in the first place." This application of the general rule of proximate causation is recognized in Ohio. In *Pennsylvania R. R. Co. v. Snyder,* 55 Oh. St. 342, 359, 360, 45 N. E. 559, 562, one railroad company delivered to another for transportation a car which was defective and which it had not properly inspected and repaired; an employe of the latter company was injured while handling the car and it was held that the first company was responsible to him in damages. The Court said that to relieve the first company from the consequences of its negligence it was not enough that the act of the second company was nearest in the order of events to the injury nor that without it the injury would not have occurred; that it was not essential to the liability of the first company that its negligence should be the sole cause of the injury, but if the result was produced by the negligence of both companies, each contributing a necessary condition to the result, either, or both, might be held responsible at the election of the party injured; that neither could claim exoneration on account of the fault of the other; that the negligence of the first company was undoubtedly the primary or proximate cause; that the most that could be claimed from the omission of the proper inspection by the second company was that it failed to cure or remove the previous negligence of the first company and thereby interrupt the consequences which were likely to, and did, flow from it; and that such failure could not with propriety be said to have broken the connection between the negligence of the first company and the injury resulting from the use of

the defective car or to have been the self-operating cause of the injury. In *Szabo v. Tabor Ice Cream Co.*, 37 Ohio App. 42, 46, 174 N. E. 18, 19, it was stated that the intervention of a responsible human agency between the defendant's alleged wrongful act and the injury complained of did not absolve the defendant from liability if his negligence and that of the intervening human agency coöperated in bringing about the injury. In *Pugh v. Akron-Chicago Transportation Co.*, 64 Ohio App. 479, 486, 28 N. E. (2) 1015, 1019, 1020, it was said again that to relieve a person from the consequences of his negligence it was not enough that the negligent act or omission of another was nearest in the order of events to the injury nor that without it the injury would not have occurred; that to have this effect it must have been the efficient, independent and self-producing cause, disconnected from the negligence of the first person; and that, if the intervening event was one which was not entirely improbable, and that the defendant's negligence was an essential link in the chain of causation, the causal connection between the defendant's negligence and the plaintiff's damage was not broken.

> 5. If the accident was the result of defendants' negligence are they legally responsible therefor to this plaintiff?

Since the verdict of the jury established that defendants were negligent and by their negligence caused the accident the important question arises whether they incurred thereby any liability to plaintiff,—whether they owed a duty to any one other than the East Ohio Gas Company for which they constructed and installed the tank. Throughout the last century and the first years of the present one all authorities were to the effect that there was no such duty, and therefore that no liability existed such as to make defendants responsible in damages to this and similar plaintiffs. But the epochal

decision in 1916 of the New York Court of Appeals in *MacPherson v. Buick Motor Co.,* 217 N. Y. 382, 111 N. E. 1050, following an early decision (1852) of that Court in the case of a dealer who labelled a deadly poison as a harmless medicine (*Thomas v. Winchester,* 6 N. Y. 397), pointed the way to a more just and logical appraisal of liability in such a case; it held that an automobile manufacturer who used a defective wheel purchased from another concern, the defect being discoverable by reasonable inspection, was liable to a person who purchased the automobile from a retail dealer and was injured by reason of the collapse of the car due to the defective wheel, and that such liability did not grow out of contract but had its source in the law, which imposed a duty on the manufacturer to the ultimate user of the car. This view of the law has since been generally adopted and has found expression in several sections of the Restatement of Torts, as follows: §388: "One who supplies directly or through a third person a chattel for another to use, is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be in the vicinity of its probable use, for bodily harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier (a) knows, or from facts known to him should realize, that the chattel is or is likely to be dangerous for the use for which it is supplied; (b) and has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition; and (c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be so." §394: "The manufacturer of a chattel, which he knows to be, or to be likely to be, dangerous for use, is subject to liability as stated in §388 . . ." §395: "A manufacturer who fails to exercise reasonable care in the manufacture of a chattel which, unless carefully

made, he should recognize as involving an unreasonable risk of causing substantial bodily harm to those who lawfully use it for a purpose for which it is manufactured and to those whom the supplier should expect to be in the vicinity of its probable use, is subject to liability for bodily harm caused to them by its lawful use in a manner and for a purpose for which it is manufactured." §398: "A manufacturer of a chattel made under a plan or design which makes it dangerous for the uses for which it is manufactured is subject to liability to others whom he should expect to use the chattel lawfully or to be in the vicinity of its probable use for bodily harm caused by his failure to exercise reasonable care in the adoption of a safe plan or design." These principles have been adopted in practically all jurisdictions, as illustrated by the decisions in such a variety of cases as *M'Alister v. Stevenson* (1932) A. C. 562; *Howard v. Furness Houlder Argentine Lines, Ltd.*, 2 All Engl. L. R. Ann. (1936) 781; *DeLape v. Liggett & Myers Tobacco Co.*, 25 Fed. Supp. 1006; *Todd Shipyards Corporation v. United States*, 69 Fed. Supp. 609; *McCloud v. Leavitt Corp.*, 79 Fed. Supp. 286; *Pennsylvania Steel Co. v. Elmore & Hamilton Contracting Co.*, 175 F. 176; *United States Radiator Corp. v. Henderson*, 68 F. 2d 87; *Spencer v. Madsen*, 142 F. 2d 820; *Steber v. Kohn*, 149 F. 2d 4; *Sieracki v. Seas Shipping Co., Inc.*, 149 F. 2d 98; *Crane Co. v. Davies*, 30 Ala. App. 471, 8 So. (2) 189; *O'Rourke v. Day and Night Water Heater Co.*, 31 Cal. App. (2) 364, 88 P. (2) 191; *Bateman v. Doughnut Corporation of America*, 63 Cal. App. (2) 711, 147 P. (2) 404; *Tingey v. E. F. Houghton & Co.*, 30 Cal. (2) 97, 179 P. (2) 807; *Monroe v. Guess*, 41 Ga. App. 697, 154 S. E. 301; *Simmons Co. v. Hardin*, 75 Ga. App. 420, 43 S. E. (2) 553; *Lill v. Murphy Door Bed Co. of Chicago*, 290 Ill. App. 328, 8 N. E. (2) 714; *Holland Furnace Co. v. Nauracaj*, 105 Ind. App. 574, 14 N. E. (2) 339; *Gordon v. Nehi Beverage Co.*, 298 Ky. 836, 183

S. W. (2) 795; *Carter v. Yardley & Co., Limited,* 319 Mass. 92, 64 N. E. (2) 693; *Macres v. Coco-Cola Bottling Co., Inc.,* 290 Mich. 567, 287 N. W. 922; *O'Brien v. American Bridge Co. of New Jersey,* 110 Minn. 364, 125 N. W. 1012; *Wright v. Holland Furnace Co., Inc.,* 186 Minn. 265, 243 N. W. 387; *Murphy v. Barlow Realty Co.,* 206 Minn. 527, 289 N. W. 563; *Casey v. Wrought Iron Bridge Company,* 114 Mo. App. 47, 89 S. W. 330; *McLeod v. Linde Air Products Co.,* 318 Mo. 397, 1 S. W. (2) 122; *Wallace v. Herman Body Co.,* 349 Mo. 1093, 163 S.W.(2) 923; *Zesch v. Abrasive Co. of Philadelphia,* 353 Mo. 558, 183 S. W. (2) 140; *Holmes v. Schnoebelen,* 87 N. H. 272, 178 A. 258; *Clark v. Standard Sanitary Mfg. Co.,* 8 N. J. Misc. 284, 149 A. 828; *Weiner v. Mager & Throne, Inc.,* 3 N. Y. S. (2) 918; *Noone v. Fred Perlberg, Inc.,* 49 N. Y. S. (2) 460; *Statler v. George A. Ray Mfg. Co.,* 195 N. Y. 478, 88 N. E. 1063; *Smith v. Peerless Glass Co., Inc.,* 259 N. Y. 292, 181 N. E. 576. (See other cases collected in 164 A. L. R. 587, note 19).

In Pennsylvania the earlier cases (*Curtin v. Somerset,* 140 Pa. 70, 21 A. 244; *Fitzmaurice v. Fabian,* 147 Pa. 199, 23 A. 444; *First Presbyterian Congregation v. Smith,* 163 Pa. 561, 30 A. 279; *Smith v. Pennsylvania R. R. Co.,* 201 Pa. 131, 50 A. 829; *Stubbs v. Duquesne Light Co.,* 84 Pa. Superior Ct. 1), adopted the then prevailing doctrine, but, if not actually overruled, they have at least been discarded as controlling authorities and all the more recent cases in this Commonwealth have followed the principles proclaimed in *MacPherson v. Buick Motor Co.*: *Grodstein v. McGivern,* 303 Pa. 555, 154 A. 794; *Griffith v. Atlantic Refining Co.,* 305 Pa. 386, 157 A. 791; *Bisson v. John B. Kelly Inc.,* 314 Pa. 99, 170 A. 139; *Saganowich v. Hachikian,* 348 Pa. 313, 35 A. 2d 343; *Lambert, Administratrix, v. Richards-Kelly Construction Co.,* 348 Pa. 407, 35 A. 2d 76; *Maize, Administrator, v. Atlantic Refining Co.,* 352 Pa. 51, 41 A. 2d 850; *Bollin v. Elevator Construction & Repair*

*Co., Inc.,* 361 Pa. 7, 17, 18, 63 A. 2d 19, 23, 24; *Bastl v. Papale,* 142 Pa. Superior Ct. 33, 15 A. 2d 476.

As far as the law of the State of Ohio is concerned, by which, as hereinbefore stated, the liability of defendants is to be determined, there is no doubt that the same view of this subject has now been taken as in other jurisdictions. Thus in *White Sewing Machine Co. v. Feisel,* 28 Ohio App. 152, 162 N. E. 633, it was held that the manufacturer of an electric sewing machine was liable to the members of the family in the home of plaintiff's mother who had purchased it from the defendant, this liability being irrespective of contract but arising from negligence in failing to use ordinary care in the manufacture and inspection of the machine with the result that it was not properly insulated; it was held that the danger to the members of the family from such a defective appliance should have been foreseen and that the defendant was under the duty of reasonably inspecting the parts of the machine bought from another manufacturer. The *MacPherson v. Buick Motor Co.* case was cited and extended portions of it quoted with approval. In *Dow Drug Company v. Nieman,* 57 Ohio App. 190, 201, 202, 13 N. E. (2) 130, 135, it was said: "That there is a liability upon a negligent manufacturer who sells articles knowing they are intended for resale to sub-purchasers is clear from the trend of modern authorities." The *MacPherson v. Buick Motor Co.* case was again cited. The action there was by a person who had purchased a cigar in a drug store; it exploded and he was injured. He brought suit against the proprietor of the drug store and against the manufacturer of the cigar. Although there was a verdict in favor of the latter the Court said that there could be no doubt that there was evidence of negligence in the manufacture of the cigar and that, under such circumstances, the case had been properly submitted to the jury. In *Gilbride v. James Leffel & Co.,* 37 Ohio Law

Abstract 457, 47 N. E. (2) 1015, the action was against the manufacturer of a boiler which collapsed and caused the death of an employe of the purchaser. Although there was a verdict for defendant on the ground that no negligence in the construction of the boiler was shown the Court stated that the plaintiff was not precluded from recovery merely because no contractual relationship existed between the manufacturer and the decedent. It is clear, therefore, that the law of Ohio on this question is in accord with that which prevails generally in England and throughout the United States.

Defendants contest the application of the doctrine to realty, claiming that this would constitute an extension beyond its scope as originally proclaimed. In reply to this contention it may be said, in the first place, that it is questionable whether the tanks installed on the land of the East Ohio Gas Company were not chattels. In *Zangerle v. Evatt,* 22 Ohio Op. 344, it was held that articles that were merely accessory to a refinery in the petroleum business and had been put on the premises for that purpose and not as accessions to the real estate, retained their character as personal property, although they were of ponderous size, some of them held in place by their own weight and others set upon concrete foundations. In *Zangerle, Auditor, v. Standard Oil Company of Ohio,* 144 Oh. St. 506, 60 N. E. (2) 52, it was held that machinery and equipment used in the process of oil refining and installed on land for the benefit of a refining industry located thereon, and which, if the industry itself was removed, would be of no particular benefit to the naked land, were personal property. It was said in that case that the decisive test was whether the chattel was devoted primarily to the business conducted on the premises or to the use of the land on which the business was operated. In *Standard Oil Company v. Zangerle, Auditor,* 144 Oh. St. 523, 60 N. E. (2) 59, it was held that machinery and equip-

ment of the steam boiler plant of an oil refinery, though firmly affixed to the land or to foundations constructed thereon, but which were specially designed and constructed to produce steam for the purposes of the refinery, were more properly accessory to the business conducted on the realty than to the realty itself and were therefore to be regarded as personal and not real property. In *Zangerle, Auditor, v. Republic Steel Corporation,* 144 Oh. St. 529, 60 N. E. (2) 170, it was held that certain steel plant processing machinery and equipment of various sizes and weights ranging from 750 lbs. to almost 950 tons, which were used solely in a highly specialized manufacturing business and would be of no benefit to the land if the particular industry were removed, were to be deemed personalty. In *Roseville Pottery, Inc., v. County Board of Revision of Muskingum County,* 149 Oh. St. 89, 77 N. E. (2) 608, it was held that a steam boiler plant firmly affixed to the land on foundations constructed thereon but specially designed to produce steam for the particular business in which it was used, was accessory to the business rather than to the realty and therefore a chattel and not a fixture. It would seem, therefore, that under the law of Ohio the tank here in question would be held to be a chattel, although it is true that the cases thus cited were concerned more especially with the problem of taxation under the particular wording of a tax statute. Even if, however, it might be held in Ohio that such a tank, although for use solely in the business of the East Ohio Gas Company and although resting merely by its own weight upon a concrete foundation, was to be regarded as realty and not as a chattel, there is no reason to believe that the law governing liability in cases such as the present should be, or is, in any way different where real structures are involved instead of chattels. There is no logical basis for such a distinction, and it would obviously be absurd to hold that a manufacturer

would be liable if negligent in building a small, readily movable tank which would undoubtedly be a chattel, but not in building an enormously large and correspondingly more potentially dangerous a one that legalistically was classified as realty. The principle inherent in the *MacPherson v. Buick Motor Co.* case and those that have followed it is that one who manufactures and delivers any article or structure with the knowledge that it will be subjected to use by others, must, for the protection of human life and property, use proper care to make it reasonably safe for such users and for those who may come into its vicinity; certainly the application of that principle cannot be made to depend upon the merely technical distinction between a chattel and a structure built upon the land. This is recognized in Restatement, Torts, which states, §385, that "One who on behalf of the possessor of land erects a structure or creates any other condition thereon is subject to liability to others within or without the land for bodily harm caused to them by the dangerous character of the structure or condition after his work had been accepted by the possessor under the same rules as those stated in §§394 to 398, 403 and 404 as determining the liability of one who as manufacturer or independent contractor makes a chattel for the use of others." Some of the cases hereinbefore cited from Pennsylvania and other jurisdictions involved buildings or equipment erected on, or attached to, the land, and no American jurisdiction has made any distinction in this respect between personalty and realty; there is therefore no reason to suppose that the courts of Ohio would declare the law in this regard to be any different than it is elsewhere held to be; on the contrary, we must assume that they would follow along the same legal pathways as the courts of other States. This is not, as defendants claim, "extending" the present Ohio law, but merely interpreting it in accordance with the views of the common law which

are entertained in other jurisdictions and which are clearly in accord with logic and justice alike.

Defendants call attention to the so-called landlord and tenant cases, which hold that ordinarily a landlord is not subject to liability to the tenant, or to persons on the premises in the tenant's right, for harm caused by a defective condition thereon which may have existed at the time the tenant took possession. That rule, however, is not applicable to third persons who are injured *outside* the leased land. "A lessor of land who transfers the possession thereof in a condition which he realizes or should realize as involving unreasonable risk of bodily harm to others outside the land, is subject to the same liability for bodily harm subsequently caused to them thereby as though he had remained in possession": Restatement, Torts, §379. Therefore, if defendants had themselves owned and leased this tank to the East Ohio Gas Company with knowledge of the potentially dangerous defects which the jury evidently found to have existed, they would, even on the theory of the landlord and tenant cases, have been liable to employes of the East Ohio Gas Company working in the immediate vicinity of the tank.

The fact that a period of thirteen months elapsed between the time when defendants finally turned the tank over to the East Ohio Gas Company for operation and the time when the accident occurred does not in itself exempt defendants from liability. The mere passage of time did not break the chain of causation since the condition caused by defendants' negligence continued uninterruptedly toward what plaintiff claims to have been its inevitable and predestined end. Of course, the fact that the tank, subject to occasional indications of trouble, stood up so long without the happening of any serious accident was evidence to be considered in connection with the question as to whether there had been any initial defect in the design or material of the tank,

but defendants were not excused if there were inherent in its construction the germs of the disaster which led to its final collapse: cf. *Nicholson v. Buffalo, Rochester & Pittsburgh Rwy. Co.,* 302 Pa. 41, 44, 153 A. 128, 129.

6. Does liability extend to *all* of the defendants in this action?

This suit was originally brought against Pittsburgh-Des Moines Company, a corporation, Pittsburgh Des Moines Steel Company, a partnership, and three of the members of that partnership; two of the latter could not be served and judgment was entered in their favor. The verdict of the jury was against the partnership, the corporation, and the one partner who was served. The contract for the manufacture of the tank was entered into by the partnership, which also erected the tank at the East Ohio Gas Company's plant; the fabrication of the steel was done by the corporation at its plant at Neville Island. These two concerns, for all practical purposes, constitute a single entity, the only reason for the existence of the partnership being, admittedly, to avoid the necessity of registering as a foreign corporation in the various States in which defendants carry on their business. In connection with the negotiation of the contracts for the erection of the tanks the correspondence was carried on indiscriminately by the corporation and the partnership; the steel and other materials were purchased by the one or the other without any planned distinction; the sign over the plant of the corporation had on it the name of the partnership; the offices of the partnership and the corporation were in the same building, and many of the employes, including the chief engineer on the construction of the No. 4 tank, were common to both, so that it would be almost impossible to determine whether those working on any particular phase of the project were doing so on behalf of the one or the other organization. Their activities being thus intertwined, the testimony

was amply sufficient to justify the presentation to the jury of the question whether the partnership and the corporation were not equally involved in the contract and in the construction and installation of the tank, and therefore equally bound to respond to plaintiff's claim: cf. *McNeil & Brother Co. v. The Crucible Steel Company of America,* 207 Pa. 493, 496, 497, 56 A. 1067, 1068; *Fleming v. Philadelphia Company,* 234 Pa. 74, 80, 82 A. 1095, 1097; *McCarthy v. Ference,* 358 Pa. 485, 499, 58 A. 2d 49, 56.

    7. Is plaintiff's right of recovery barred by the Statute of Limitations?

The present action was instituted within a year of October 20, 1944, the date of the happening of the accident and decedent's death. It is defendants' contention that whatever breach of duty they committed occurred when the No. 4 tank was erected and turned over to the East Ohio Gas Company in September, 1943, and therefore that the Statute of Limitations should be held to have run from that date. It would seem elementary, however, that a cause of action cannot accrue until an injury is actually inflicted upon the person bringing the suit, and certainly until October 20, 1944 no action of any kind could have been brought by the present plaintiff; it is inconceivable that she should be barred by lapse of time before the time when she could have instituted a suit. It is true that the running of the statute is not postponed by the failure of a plaintiff to *realize* that he has suffered damage, or by the belated appearance of a disease or infirmity which was not revealed when the injury was actually inflicted: *Bernath v. LeFever,* 325 Pa. 43, 46, 189 A. 342, 343. But, as already stated, a right of action accrues only when injury is sustained by the plaintiff,—not when the causes are set in motion which ultimately produce injury as a consequence: *Pollock v. Pittsburgh,*

*Bessemer & Lake Erie R. R. Co.,* 275 Pa. 467, 473, 119
A. 547, 549; *Rudman v. City of Scranton,* 114 Pa.
Superior Ct. 148, 152, 173 A. 892, 894. It follows that
plaintiff's suit was brought in time, as the court below
properly held.

### Conclusion

By reason of the foregoing discussion of the ques-
tions here involved, we are of opinion,—in agreement
with a similar decision rendered by the United States
Court of Appeals for the Third Circuit in a suit grow-
ing out of the same accident (*Moran v. Pittsburgh-
Des-Moines Steel Co. et al.,* 166 F. 2d 908),—that
plaintiff's case, under the testimony presented by her,
was one that required submission to the jury, and
that the court below was therefore in error in granting
defendants' motion for judgment n. o. v. However,
defendants also presented to the court a motion for
a new trial which the court refused, saying: "In view
of this conclusion [that the motion for judgment n. o. v.
must be granted] we do not think we should consider
the reasons advanced for a new trial, but should
*formally* refuse the motion for same". Since the motion
for a new trial specified reasons in support thereof which
are not before this court on the present appeal and
which require the trial court's consideration,—namely,
that "The verdict was against the weight of the evi-
dence", and that "The verdict was excessive,"—the rec-
ord must be remitted to the court below with direction
to reinstate and act upon that motion.

### Order

The judgment is reversed, and the record is remitted
to the court below with direction to reinstate and act
upon defendants' motion for a new trial.