Superior Wall Products Co. v. The Employers Liability Assurance Corp., Ltd.

# Superior Wall Products Co. v. The Employers Liability Assurance Corp., Ltd.

*Marvin J. Brenner* and *Edmonds, Obermayer & Rebmann,* for plaintiff.

*Norman Paul Harvey* and *John J. McDevitt, 3rd,* for defendant.

OLIVER, P. J., November 4, 1957.—Plaintiff sued defendant on a "Boiler and Machinery Insurance" policy to recover damages plaintiff sustained as a result of an accident, as defined in the policy, to a hot water storage tank, which flooded the basement of plaintiff's plant. Defendant contended the policy did not cover the loss in question. The jury returned a verdict in favor of plaintiff in the sum of $3,803.95. Defendant filed motions for new trial and judgment n. o. v. After argument was heard, defendant's motions were dismissed.

The hot water tank was located in the boiler room which contained two oil-fired heating boilers and the hot water storage tank which furnished hot water for the wash rooms. This tank was two feet in diameter and six and a half feet in length. It held about 140 gallons and was covered by asbestos about one and a quarter inches thick.

The water in this hot water storage tank was heated by coils in one of the heating boilers, which were connected by circulating pipes to the tank. The nature of plaintiff's business required that the temperature in its premises be maintained at 80 degrees in the daytime and at 70 degrees during the night. The weather was cold, near freezing, on Saturday, December 18, 1954, at which time the plant was closed for the weekend. No water, of course, was thereafter drawn from the hot water tank and the water therein was heated to a high degree by the necessity of maintaining a substantal pressure in the heating boiler.

The heating system had been inspected at 10 a.m. on Friday, December 17, 1954, by an employe of defendant and had been found to be in proper order. On Sunday, December 19, 1954, plaintiff's head shipper returned to the building to do some paper work. Seeing the electric clocks had stopped, he investigated and found six to seven feet of water in the boiler room.

A registered plumber, James Gleason, was summoned. He walked on top of the boilers to turn the water off at the tank. He found water spurting out of the top of the hot water tank with such force it was hitting the ceiling three feet above the tank and mushrooming all over the boiler room. The circuit breaker room was also flooded. It took about three hours to pump out the water. The boilers, the oil burner and the circuit breaker required repairs to the extent of $3,803.95.

Upon inspection, Gleason, the plumber, found a hole in the top of the tank one half to five eighths of an inch wide. A similar hole was found in the asbestos covering. Subsequently, the tank was quartered and taken by defendant for examination.

Gleason testified that the tank was full of rust barnacles, which condition is always found in a water tank after it has been in use for four or five years, that the hole at the top was irregular and that the hole had been caused by "internal pressure or something similar to that which would force metal to give or make a hole in it". He also testified that, as the temperature in the heating boiler increased, so would the temperature of the water in the coils and in the storage tank. This would create pressure in that tank. The less water used, the hotter the water in the tank would become, so that it would reach 240 degrees to 245 degrees in cold weather. The city water pressure would also add to the internal pressure in the tank.

No witness testified specifically that deterioration alone caused the tank to give way. And one of defendant's experts, Grandizio, conceded that, if pressure were present inside the tank, it would more than likely give way. Counsel for defendant conceded there was such pressure.

Plaintiff had carried "Boiler and Machinery Insurance" with defendant continuously from 1947. During that time defendant, by its duly licensed inspectors,

made yearly inspections of the hot water storage tank, and as a result of such inspections, the Commonwealth of Pennsylvania repeatedly issued licenses for the operation and use of this tank by plaintiff. At no time did defendant or its agents report to plaintiff the presence of any leaks or defects in the tank, or any danger therefrom.

Section C of the policy (unfired vessels) describes the coverage applicable to plaintiff's hot water storage tank. "Accident" is defined in that section as follows: "A sudden and accidental tearing asunder of the object, or any part thereof, caused by pressure of contents therein or caused by vacuum therein, but cracking shall not constitute a sudden and accidental tearing asunder."

Defendant at the trial contended that the words "or any part thereof", as used in the phrase "a sudden and accidental tearing asunder of the object, or any part thereof, caused by pressure of contents therein", should be interpreted as referring *solely* to an integral part which could be separated from the whole, like an automobile part. If that were the intention of defendant when drafting the policy, such intention could readily have been expressed by referring to "the object, or any of *the parts* thereof". As the policy was drawn, the words "any part" referred merely to any portion of the tank, as distinguished from the tank as a whole. Obviously, since the policy was drawn by defendant, it should be construed, where any such difference in meaning is raised, against defendant.

In its brief in support of its motions, defendant stated: "Courts have often said that policies of insurance must be interpreted as a person of ordinary common sense and business judgment would understand the meaning to be," and also "the portions of the contract which were involved in this case are not ambiguous but plain and clear", and yet defendant complained

in that same brief because the trial judge did not read to the jury definitions of such simple words as "accidental", "sudden" and "tearing asunder" as contained "in the Britannica World Language Edition of Funk and Wagnall's New Practical Standard Dictionary".

On the other hand, having contended that the words in the policy, "or any part thereof", should be understood as meaning, "or any of *the* parts thereof", defendant objected because the trial judge instructed the jury that the policy should be read as actually drawn, since defendant was the draftsman. In Levinton v. Ohio Farmers Insurance Co., 267 Pa. 448 (1920), page 452, it was held, with reference to an insurance policy, that: "If doubt exists as to the meaning, it should be resolved in favor of the assured rather than in the interests of the insurer." The doubt in respect to the phrase mentioned was one which defendant itself raised at the trial, thereby making necessary the comment by the trial judge.

The evidence here clearly establishes that there was in this case a sudden and accidental tearing asunder of a portion of this tank, to wit, an irregular spot in the top thereof, by reason of pressure of the contents of the tank. That was the finding of the jury and we are of the opinion it should not be disturbed.

We do not think defendant has any right to contend that the bursting out was due to the fact the tank had been weakened through the accumulation inside of rust barnacles. Defendant, through its expert inspectors, had examined that tank every year and by their favorable reports had caused the Commonwealth of Pennsylvania to issue licenses for the operation and use of the tank by plaintiff for each year from 1947 down to the date of the accident. Also, defendant had collected premiums from plaintiff throughout that period for insurance on the tank. Defendant had the superior knowledge and experience. If defendant in-

tended to evade responsibility on the ground that the tank was deteriorating through the years, it should have so notified plaintiff which clearly relied upon defendant's superior knowledge and repeated inspections.

This case was fully and properly submitted to the jury. In part, the trial judge charged: "The right of the plaintiff to recover depends upon whether this was an accident or whether it wasn't, and the policy defines 'accident'. It gives several definitions, but the one that would be applicable to this case is the first one: 'A sudden and accidental tearing asunder of the object.' As I recall it, defendant's counsel read that part to you, but there are two important additions which, so far as I recall, he did not read—'or any part thereof'. It is a tearing asunder of the object or an part thereof, 'caused by pressure of contents'. Of course this didn't tear asunder the whole object, but was this a tearing asunder of a part of that tank by pressure of the contents inside—the hot water?" The jury found in the affirmative. We are of the opinion its verdict should stand.

In Foley v. The Pittsburgh Des Moines Co., 363 Pa. 1, (1949), at page 20, the court held: ". . . All that the law requires in such cases is that the evidence be such as to satisfy a reasonable and well-balanced mind; it is not necessary that a plaintiff be able to prove the cause of the accident by direct evidence, it being sufficient if the testimony supports inferences which may reasonably be drawn by the jury."

Defendant also complains because the court charged: "The burden is upon the plaintiff to prove that this tank, or this particular part of the tank, was burst asunder by the internal pressure within the tank." In defendant's opinion that was fundamental error because it did not contain the phrase, "by a fair preponderance of the evidence". But our Supreme Court in Se-Ling Hosiery, Inc., v. Margulies, 364 Pa. 45

(1950), held that, in civil cases, omission of that phrase does not constitute reversible error.

Furthermore, if defendants' counsel had wanted any specific words added, he should have suggested those words to the trial judge. An attorney's oath is to conduct himself with due fidelity to the court as well as to his clients. There is a lack of such fidelity where an attorneys deems certain words of such magic import as to cause their omission to constitute fundamental error, and yet, having them definitely in mind, fails to call them specifically to the attention of the trial judge and then, because of their omission, demands a new trial.

In our opinion defendant's motions were properly dismissed.

### Final Judgment

October 10, 1957: Judgment on the verdict, 12:06 p.m.