Della Porta, Appellant, *v.* Pennsylvania Railroad Company.

594

Argued April 22, 1952.   Before DREW, C. J., STERN,
STEARNE, JONES, BELL, CHIDSEY and MUSMANNO, JJ.

*Sheldon W. Farber,* with him *Michael A. Spatola,* for appellants.

*Thomas Raeburn White,* with him *Thomas Raeburn White, Jr.* and *White, Williams & Scott,* for appellees.

OPINION BY MR. JUSTICE ALLEN M. STEARNE, May 29, 1952:

This is an appeal from the refusal of a court in banc to take off a compulsory non-suit entered at the trial of an action in trespass. The suit was brought by a minor, through his father as guardian, and by the minor's parents in their own right, to recover damages for personal injuries sustained by the child in the ladies' lounge at the North Philadelphia Station of the Pennsylvania Railroad Company.

Such lounge is approximately twenty feet square and has a mirror about three feet wide on one wall. On either side of the mirror is a window six feet wide, with a steam radiator about five and one-half feet wide directly in front of each window. On November 5, 1948, the mother, Eleanor Della Porta, entered the lounge accompanied by her five and one-half year old nephew and her one and one-half year old son, the minor plaintiff. The radiators were heated, but the windows were open because the weather was mild. While female plaintiff was looking into the mirror, she heard her nephew say "Look at the train" and observed him picking up her child. She directed her attention to the mirror momentarily, until she heard the infant scream. She then turned and snatched him from the radiator, where the older child had placed him so that he might view the passing trains. The tender flesh of the child's bare legs was severely burned during the short period of contact with the radiator.

Plaintiffs' entire theory of liability is contained in this statement in their paper book: "The radiator

in question, at the time of the accident, was both actually and in legal contemplation a highly dangerous instrumentality." There is no allegation that the radiators were defective in any way—only that they were hot. The picture offered in evidence shows that they were ordinary cast-iron radiators, and counsel admitted orally that they were much like the radiators in the room in which this Court heard argument on the case. No reason has been suggested why we should permit submission of the question of the dangerous nature of these radiators to a jury unless we are prepared to rule as matter of law that the countless thousands of steam radiators which heat homes, schools, hospitals, churches, offices, and courtrooms may constitute dangerous instrumentalities. Counsel for appellants have cited many cases in which dangerous instrumentalities have been found to exist, but it is significant that none presents a factual situation remotely similar to the one at bar. In *Farbarik v. Jones,* 67 Pa. Superior Ct. 517 and *Straight v. B. F. Goodrich Company,* 354 Pa. 391, 47 A. 2d 605, unattached radiators toppled and injured plaintiffs. The only negligence involved was the failure to properly secure them; the heating properties of the radiators had nothing to do with the result in either case. The following cases involved defects in construction which caused injuries: *Anderson v. London Guarantee & Accident Co.,* 295 Pa. 368, 145 A. 431, where a boiler burst under pressure during an inspection; *Malitovsky v. Harshaw Chemical Company,* 360 Pa. 279, 61 A. 2d 846, where defendant was "negligent in knowingly permitting a *defective drum* containing highly dangerous acid to lie in the common areaway without notice to plaintiff."; and *Foley v. The Pittsburgh-Des Moines Company,* 363 Pa. 1, 68 A. 2d 517, where faulty design of a gas tank caused leakage and subsequent fire.

Plaintiffs argue most strenuously that *Howlett v. Dorchester Trust Co.,* 256 Mass. 544, 152 N. E. 895, is "the only case decided in the United States in which all of the controlling facts are on all fours with the case at bar." In that case, plaintiff placed her two year old son "upon a smooth, mahogany topped bench, provided by the defendant for use by those coming to the premises, which stood from eight inches to two feet away from a vapor heating radiator, then heated to at least two hundred twelve degrees Fahrenheit, and not guarded in any way from contact with anyone upon the bench." While the mother was attending to her banking, the child in some unexplained way fell onto the radiator and was burned. In sustaining a jury's verdict for plaintiff, the Massachusetts court said: "It remains to decide whether there was negligence on the defendant's part, and, although the question is close, upon the evidence it was for the jury to say whether the existing *combination* of bench and unguarded radiator was reasonably safe." (emphasis supplied) The distinction is obvious: the Massachusetts court felt that the bank should have anticipated the possibility that someone might slip from the smooth bench onto the hot radiator. We do not feel that defendants herein were bound to anticipate that anyone would deliberately contact a radiator which was isolated from the furniture in the room or that one child would place another in contact with such radiator. It is significant in this connection that female plaintiff did not anticipate any such action although she observed her nephew lifting the child and telling him to look at the train.

Plaintiffs are not aided at all by testimony that it was customary for mothers to take their small children with them into the lounge. The more they argue that it was customary for children to be present, the more they demonstrate that such children were invariably in

the immediate custody and under personal supervision of adults. The Railroad Company was not bound to protect the children against a condition which they could reasonably expect their adult parents to discover.

Since no controlling authority has been cited to us or discovered by our own research, we must decide as a question of first impression whether or not an ordinary steam radiator can be considered a dangerous instrumentality. Plaintiffs properly suggest Restatement, Torts, §343, as the appropriate standard: "A possessor of land is subject to liability for bodily harm caused to business visitors by a natural or artificial condition thereon if, but only if, he (a) knows, or by the exercise of reasonable care could discover, the condition which, if known to him, he should realize as involving an unreasonable risk to them, and (b) has no reason to believe that they will discover the condition or realize the risk involved therein, and (c) invites or permits them to enter or remain upon the land without exercising reasonable care (i) to make the condition reasonably safe, or (ii) to give a warning adequate to enable them to avoid the harm without relinquishing any of the services which they are entitled to receive, if the possessor is a public utility."

The steam radiator has so long been a common fixture in our society that every adult person is chargeable with knowledge that it must be hot in order to serve its purpose and is to that extent "dangerous". Whatever risk is attendant upon keeping a radiator hot is not an "unreasonable risk" but is a necessary concomitant to the heating function which it serves and is justified by its utility.

Plaintiffs further complain that the trial judge erred in excluding expert testimony on methods which might have been used to make the installation safer, and custom with respect thereto. The learned court below

properly concluded that there was no occasion for admitting opinion evidence because the "circumstances here could be described to the jury and their bearing on the issue estimated by persons without special knowledge or training." See *Magyar v. Pennsylvania R. R. Co.*, 294 Pa. 585, 591, 144 A. 765; *Delair v. McAdoo*, 324 Pa. 392, 397, 188 A. 181; *Jacob v. Philadelphia*, 333 Pa. 584, 588, 5 A. 2d 176.

The question of proximate cause, which was argued at length, is therefore unimportant. Plaintiffs proved no negligence on the part of defendants in maintaining an ordinary steam radiator for the purpose of heating the lounge in the railroad station. The judgment of non-suit was properly entered.

Judgment affirmed.

————

DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

Water boils at 212° Fahrenheit. The evidence in this case reveals that the radiator on which the minor plaintiff was injured functioned at a temperature of 212° Fahrenheit. If, instead of a radiator, the defendants had maintained an open vat of boiling water, and a child had been scalded by water escaping from the vat there could be no question of the defendant's negligence. Nor would anyone doubt the defendant's responsibility for burns incurred if the child had simply brushed against the outside of the boiling vat. The fact that the boiling water, instead of hissing in an open vat, seethed in cast iron tubes, did not reduce the temperature of the water nor decrease the danger of burning if one came into contact with the tubes.

A temperature which will inflict third degree burns upon a child's legs to the point where the flesh becomes shredded and adheres to the instrumentality containing that heat is such a temperature as will burn a man's

hand or any other part of his body which might come into contact with it.

The fact that this appalling heat agency is contained in so commonplace an article as a radiator does not alter or modify its inherent potentialities for inflicting serious injury on those unaware of the existing peril.

The duty of a common carrier towards its invitees is one of the highest care, short only that of insurer. *Archer v. Pittsburgh Rwys. Co.,* 349 Pa. 547; *Dayen v. Penn Bus Co.,* 363 Pa. 176. And, of course, there is no question that the minor and mother plaintiff, while in the lounge of the railroad station, were invitees of the defendant railroad company.

In my opinion the lower court committed grave error in not permitting the plaintiff to show by expert testimony that in other public places catering to the same kind of clientele, dangerous radiators were suitably covered or equipped with guard rails so as to prevent contact with human bodies. The only standard of care that justice expects of any one is reasonable care. What is reasonable depends upon circumstances, situation and environment. While we all know that there are many radiators which are uncovered, we also know that in numerous public places the radiators are sheathed or so situated that people cannot come into direct contact with them. And the reason for this is that the proprietors of such places are aware of the dangers attendant upon unguarded radiators.

Reasonable care, like everything else arising out of human conduct, develops with circumstances and time. Motorists today are required to do many things in order to protect the pedestrian population which decades ago would have been regarded as highly visionary. Jurisprudence advances with the awareness of the people as to the sequence of events and the irrefragable bond between cause and effect. Reasonable-

ness under the circumstances will always remain the standard of responsibility, but the circumstances are not always constant. If a radiator can be covered and thus made safe to the travelling public by the trifling expenditure of from $18 to $25, as the plaintiff offered to prove in this case, is it not a question for a jury as to whether the railroad company exercised reasonable care (or as the law requires, the highest degree of care) when it refused to install such a safeguard? Especially if it can be shown, as the plaintiff was prepared to show, that in other similar public places such covers were standard equipment?

Counsel for the defendants argue in their brief "that the proximate cause of the injury was the act of the older child in placing the plaintiff on the radiator." But if the instrumentality was inherently dangerous, the railroad would not be absolved from responsibility because an immature child did an impulsive thing. The act of Roberto was not an intervening incident which eliminated the proximateness of the cause planted by the defendant through the installation of a device inherently dangerous to children. Renato, the injured boy was one and a half years old; Roberto, who placed Renato on the radiator, was five and a half years old. The instinctive desire of the infant Roberto to have his little cousin infant Renato share with him the exciting spectacle of a passing train caused him to commit the heedless act. The combined performance of a five and a half years old child and a one and a half year old child does not total up to a mature reflection, any more than ten three-year olds can produce the thought responsibility of a thirty year-old person.

Contributory negligence, of course, is not in this case at all. The only question before us is one of proximate cause, and in that respect we must view the situation in the light of one infant climbing on to a

scalding radiator or another infant toddling up to a scalding radiator. Neither one could be charged with anticipation of consequences, especially in view of the excitement which instinctively attracted them to the window.

As far back as 1903 this Court said: " 'Children, wherever they go, must be expected to act upon childish instincts and impulses; others who are chargeable with a duty of care and caution toward them must calculate upon this, and take precautions accordingly.' " *Rachmel v. Clark*, 205 Pa. 314. This doctrine was reaffirmed in 1948. *Styer v. Reading*, 360 Pa. 212.

Appellees' counsel stated in their brief: "But assuming that defendants can be held to anticipate that a very young child may voluntarily come in contact with the radiator, any child old enough to crawl will automatically pull away from a hot object without receiving any injury, or, at most a very superficial burn." But the facts are quite to the contrary. The child was on the radiator for only a second but he sustained not a "very superficial burn," but very serious third degree burns. The burns were so serious that the child was taken to a hospital and two skin grafting operations followed. In addition, one of the child's legs had to be subjected, for a period, to a plaster cast.

Appellees' counsel argue further that the defendants were no more responsible for what Roberto did than if he had thrown Renato from a window. This bizarre illustration is not analogous at all. Casting a child from a window would certainly not involve the railroad company, but placing a child upon a scalding radiator maintained by the defendant company produces a real question of fact as to liability.

I do not agree with the majority opinion that radiators must perforce be declared innocuous because they can be found in homes, courtrooms, hospitals,

schools, churches and offices. Carpets and chandeliers are also to be found in homes, hospitals and offices, but they unfortunately have been the cause of inflicting serious injury on human beings. The most utilitarian object can, under certain circumstances, become a dangerous agency. We all know that occasionally chandeliers fall, carpets slip, stoves blow up, furnaces crack, water pipes burst, and gas tubes leak—and, as a consequence, people are injured. Did the owner of the agency which was the proximate cause of the injury exercise reasonable care under the circumstances of the case? That is always the question, and that will always be the question so long as courts and juries pass upon problems which harass and distress the human race.

I do not maintain that the negligence of the defendants in this case was established conclusively, but I do say that the unique circumstances which brought about serious injury to a helpless infant formed an issue for submission to the jury under appropriate instructions from the court. This case should not have been taken away from the jury.

A factual issue is removed from a jury's consideration only when reasonable minds cannot differ on the inferences arising out of the facts. The decisions of our appellate courts, and the appellate courts of other states, all declare that proposition uncompromisingly. Therefore, when two minds, guided by the same compass of honesty, looking at the same circumstances, can and do take two different courses of thought direction, a question arises which must be settled, in our system of justice, by the unanimous decision of twelve citizens of our Commonwealth. That was not done in this case and I, therefore, dissent.