## Lott et ux. *v.* Peoples Natural Gas Company, Appellant.

Argued October 8, 1936. Before Schaffer, Maxey, Drew, Linn, Stern and Barnes, JJ.

*John E. Evans, Sr.,* of *Margiotti, Pugliese, Evans & Buckley,* with him *J. Roy Dickie,* of *Dickie, Robinson & McCamey,* and *James B. Sayers,* for appellant.

*Charles F. C. Arensberg,* of *Patterson, Crawford, Arensberg & Dunn,* with him *Ella Graubart,* for appellees.

OPINION BY MR. JUSTICE STERN, November 23, 1936:

On February 4, 1934, an explosion of gas wrecked a house at the southeast corner of Inverness and Woodmont Streets, Pittsburgh, of which plaintiffs Clarence E. Lott and his wife Eleanor B. Lott were the owners and occupants, and injured them and plaintiff Dorothy Lott, their minor daughter. Suits brought by plaintiffs to recover for property damage and personal injuries resulted in verdicts against defendant aggregating, as reduced by the court below, $48,323.22. Defendant appeals from the overruling of its motions for judgments n. o. v. and for new trials.

The house was constructed in the years 1928-29, at which time the gas service line was laid from Inverness Street in to the property. It was a steel pipe one and a half inches in diameter, and consisted of three pieces, one 14 feet and two each 21 feet long, joined together by the ends being screwed into "sleeves" or couplings. It

was attached rigidly at the house end and lay in a perfectly straight line, except that the section nearest the street was bent in a reverse downward and outward to conform to the slope of the terrace upon which the house was built. After the line was laid it was inspected in the open trench and tested for leaks by the contractor in the presence of representatives of defendant and was found to be in proper condition. The trench was filled up a day or two thereafter, except at the extreme street end where a few days later the service pipe was connected by defendant's employees with the company's four-inch main located under and along the Inverness Street sidewalk. The lawn under which the pipe lay was not excavated again from the time of its original installation until after the explosion. Meanwhile there were some suspicious manifestations of escaping gas; during the two summers prior to the explosion plaintiffs had trouble keeping the grass growing in the neighborhood of the underlying pipe; in the winter of 1932-33 there was a smell of gas in the house; this was reported to defendant which made an examination, followed by investigations by plaintiffs themselves, but no definite escape of gas was detected. When, after the explosion, a trench was dug in order to ascertain the cause of the catastrophe, and the pipe was exposed to view, there was seen to be a large hole or fracture at the house end of the section nearest the street, that is to say, at a distance of 21 feet from the main and just where the thread of that section entered the coupling. Apparently both parties to the litigation agree that the gas must have escaped at that point and permeated the soil, but when unable to reach the atmosphere because of the frozen surface of the ground it forced its way into the basement of plaintiffs' house where it became ignited and the explosion followed.

Plaintiffs' theory of the cause of the accident, and the basis upon which they predicated their right of recovery, was that in connecting the service line with the gas main

defendant did the work recklessly and negligently in that it forced and distorted the pipe at the street end laterally toward the south, that is, in a direction away from Woodmont Street, thereby causing a sharp bending of the pipe at the first coupling, the outside of the bend projecting northerly, which in turn culminated in a fracture at the point of extreme angulation; the break may have occurred either at the time the work was done or later as a result of the weakening of the pipe due to the bending. In support of this theory plaintiffs offered considerable testimony to show that the exposed pipe, as it lay in the trench, exhibited such an angulation, and that, when a torch was moved along it a flame two or three feet high shot out from the side of the pipe at that point. Moreover—and according to plaintiffs of greatest significance,—when, in order to cut out a section three feet on either side of the fracture, the pipe was first sawed through, the part attached to the main violently sprang or lashed some nine or ten inches to and against the northerly side of the trench, showing thereby, as claimed by plaintiffs, that the cutting had released a strong lateral tension which had been the cause of the bending and breaking of the pipe. Plaintiffs argue, and produced expert testimony to establish, that this lashing is explicable in no way other than that the pipe had been forced into connection with the main in such a position, at such an angle, and in such a way, as to distort and ultimately break it.

Witnesses on behalf of defendant testified, in opposition to these contentions, that the service pipe had not in fact been forced into the main in any strained or improper manner, but that the connection was made by a series of couplings put together so as to form a swinging joint and thus allow sufficient play to prevent tension and undue rigidity, and that it would have been impossible to wrench and move the pipe, covered as it then was by several feet of earth, with sufficient force to bend and break it at a point 21 feet away. Defendant contended

that the bending and breaking of the pipe were probably caused by the soil under the pipe being wet, due to the presence of an adjoining water line, or being soft and consisting only of filled in ground, and that this had allowed a subsidence of the pipe by the action of the pressure of the overlying ground. Admittedly this would not explain a lateral angulation, but defendant asserted that the principal bending was in a vertical and not a horizontal direction, and that the break was underneath and not on the side of the pipe and therefore not due to any lateral distortion.

It is obvious that the principal issue of fact between the parties was thus narrowed to whether the bend and break were on the northerly side or on the bottom of the pipe. It has already been stated that plaintiff produced several witnesses to establish its contention on this question, thus, according to ordinary rules, presenting a case for the determination of the jury. Defendant claims, however, that binding instructions should have been given in its favor because of the following facts: When the 6-foot piece of the pipe was cut out the workmen used a hacksaw which made well-defined serrations or scorings on the two ends of the detached section. These workmen, called as plaintiffs' witnesses, testified that in using the saw they had worked it up and down in a vertical direction. Placing the section so as to bring the scorings into a perpendicular position, the angulation and break would, defendant claims, be toward the bottom rather than the side. Defendant therefore argues that these scorings, taken in connection with the testimony of plaintiffs' witnesses as to the position in which the cutting was effected, amount to incontrovertible physical facts which override plaintiffs' oral testimony as to the position in which the pipe lay, and the court should have decided the fact accordingly and not have allowed the jury to find to the contrary. Defendant relies upon the well-established principle that "A court will not accept as true that which is shown to be untrue

by incontrovertible physical facts, but instead will take judicial notice of the results arising from such facts": *Snyder v. Penn Liberty Refining Co.,* 302 Pa. 320, 322. "Of course, testimony opposed to incontrovertible physical facts and contrary to human experience and the laws of nature must be rejected": *Ross v. Riffle,* 310 Pa. 176, 180.

In the present case there are several reasons why, in the opinion of the court, the doctrine thus invoked is not applicable: (1) While the workmen who cut the pipe said that the sawing was done in a vertical direction, there was testimony which somewhat modified this on the part of defendant's own witnesses. Thus William Bechtold testified that when the pipe was placed in the position claimed by defendant the scorings were *"More on the vertical."* When asked: "Did they work the hacksaw up and down?" he replied: "It was in that [indicating] position." The position thus indicated was stated on the record to be at an angle of approximately 45 degrees. A. W. Coombs testified that at the house end of the section the hacksaw had moved at an angle of about thirty degrees. (2) Plaintiffs are, of course, bound by the testimony of their own witnesses, but the same rule applies to defendant, and its witnesses all admitted a break and bending of the pipe at least to some extent on the northerly side. Bechtold said the bend was "slightly to the left [that is, to the north] of the vertical"; it was "downward and to the left." Coombs testified that the "sag" was "downward," but "it had a tendency—facing the building, it had a slight bend to the left." J. G. Diven testified that there was a "slight deviation . . . to the left." To the extent to which there was any lateral bending of the pipe to the north, support would be given to plaintiffs' theory of the case. (3) Even if the scorings be accepted as demonstrating that the angulation was not so much to the side as toward the bottom, the bending and the fracture were sufficiently extensive and irregular in contour to make an

incontrovertible conclusion impossible from the geometrical or scientific standpoint. It must be borne in mind that the pipe was only an inch and a half in diameter, and both plaintiffs' and defendant's witnesses agreed that the bend was *somewhat* to the side and *somewhat* downward, and the break *somewhat* on the side and *somewhat* at the bottom. Plaintiffs' witness Carl E. Betz testified the hole "was on the Woodmont Street side, the outside of this angle and slightly underneath . . . the pipe," and that the break extended "more than halfway around the circumference of the pipe"; the fracture "was on the side and somewhat underneath." Lott himself testified the break "was on the north side, or the Woodmont Street side of the pipe"; it "extended from the side on down and partly under the bottom"; "it went pretty well under the bottom"; "the best of my recollection is that it ran under the pipe about to the other side." The pipe, when produced in court, was found to be "broken at least half way round," even "more than half way," although it was said this might have been due to handling. G. A. Malarkey testified the break "was on the side of the pipe, on the north side, and tapered out. The biggest part of the break was on the side, and it tapered out underneath and on top." John Cain, when asked to describe the break, said it "was pointed towards Woodmont Street" but extended "I thought a little more to the bottom." F. W. Brooke testified "the break extended up this [indicating] way, to what I would call ninety degrees, a fourth of the way up, and it extended below it one hundred degrees, but the general direction was in this and in no other way." Similar testimony was given by defendant's witnesses. Bechtold said the break was "closer to the bottom"; "facing the building, it was to the left side." When he inserted a knife blade up into the hole his hand was on the ground on a level with the bottom of the pipe, indicating that the fracture was on the side though toward the bottom. Coombs, when interrogated as to the size of

the break, said it extended "about one-fourth" of the circumference of the pipe. Diven said the hole was "quite a bit below" the center but "not down at the bottom." It is obvious, therefore, from the testimony of all witnesses, that even if the pipe lay in the position indicated by the scorings, this would weaken but not necessarily destroy plaintiffs' case, because the bend and break as thus described would not permit a controlling result to be given to the alleged "incontrovertible physical facts." (4) Photographs were made shortly after the explosion, showing the pipe in place and also the burning gas escaping from the hole when ignited in order to determine the location of the fracture. These pictures were taken either by defendant or in the presence of its representatives, and are admitted by both sides to be trustworthy. They definitely show a lateral angulation to the north and that the flame was emerging from that side of the pipe. It is true that because they were taken from a position above the trench they might not reveal a downward displacement of the pipe, nor do they conclusively determine that the fracture did not extend underneath since at that time there had been no excavation of the ground below the pipe, but they do at least prove that there was a bend and break to some substantial extent on the northerly side, and this furnishes sufficient basis for plaintiffs' theory of the cause of the explosion. The photographs establish physical facts as "incontrovertible" as those indicated by the serrations on the pipe, and while, of course, there could not be any inconsistency betwen them if both fall within the category of incontrovertibility, they can be reconciled because of the nature, extent and position of the bending and the break already referred to, and the photographs in themselves were sufficient to carry plaintiffs' case to the jury.

Defendant contends that, even granting plaintiffs' version of the cause of the accident to be tenable, there were other possible causes, and therefore the jury's verdict could have been founded only on a guess as to the actual

cause. It is true that "Where an injury may be the result of one of two or more causes, for only one of which defendant is liable, the burden is on plaintiff to individuate that one as the proximate cause of his damage, . . . otherwise there can be no recovery": *Gausman v. Pearson Co.*, 284 Pa. 348, 352; *King v. Equitable Gas Co.*, 307 Pa. 287, 294. However, "It is not necessary for the plaintiff to exclude everything which the ingenuity of counsel may suggest as possibly causing or contributing to an accident": *Gallivan v. Wark Co.*, 288 Pa. 443, 456-7; *Kapuscianski v. Phila. & Reading C. & I. Co.*, 289 Pa. 388, 392; *Rozumailski v. Philadelphia Coca-Cola Bottling Co.*, 296 Pa. 114, 119. In the present case there is apparent justification for plaintiffs' argument that the lateral northward lashing of the street section when the tension on it was released by cutting it off from the remaining portion of the pipe can be explained on no basis other than their theory.

Defendant offered two possible explanations of the accident. One was that the ground underlying the service pipe was wet or soft, and this may have allowed the pipe to subside and bend downward under the pressure of the ground above and of the weight of trucks which may have passed over the lawn while the house was being constructed and the terrace graded. In addition, however, to presenting testimony controverting the allegations as to moisture or insecurity of the ground and the passage of any trucks, plaintiffs point out that if such had been the causes and the bending of the pipe were downward, it would, when the earth above it was excavated, have sprung vertically, if at all, and not to the side of the trench. Defendant's other theory was that the pipe may have been bent laterally because of a failure to tamp the ground uniformly on both sides of it at the time of the original filling in of the trench, but plaintiffs assert that in such case the lashing of the pipe, when the lateral pressure of the ground was removed, would have been in the direction away from the point of angulation, that is,

to the south instead of the north. Plaintiffs insist, therefore, that defendant offered no solution which is consistent with all the testimony. Admitting the full extent of the burden cast upon plaintiffs, the court cannot say that the cause of the explosion as claimed by them was not sufficiently individuated, as required by the rule cited, to justify the presentation to the jury of the question of the liability of defendant as sole proximate cause of the injury.

In support of the motions for new trials, the principal complaint was that the learned trial judge permitted expert witnesses called by plaintiffs to give their opinions as to the cause of the lashing of the pipe when cut, and also of the bending and breaking. Apart from the fact that defendant also produced expert witnesses who expressed their opinions on these questions, it would seem that such testimony was entirely justified. A layman could not be expected to know or fully appreciate the laws of mechanics governing the problem involved. Questions as to the elastic limit of steel, the tensile strength of the pipe, the pressure that, in order to bend or break it, would have to be exerted at a given point by a given force acting in a given direction and at a given distance, and the principles appertaining to leverage and fulcrums, are matters requiring technical knowledge and experience beyond the range of those who have not made them the subject of special study. The fact that the opinions are in reference to the ultimate issue to be decided by the jury does not bar them if otherwise admissible: *Cooper v. Metropolitan Life Ins. Co.*, 323 Pa. 295, 302-3.

There are other assignments of error which require no specific discussion. Some of defendant's points for charge which were refused were objectionable in the inferences which they sought to establish as propositions of law, and others, in themselves proper, had been reasonably covered in the charge itself. All assignments are overruled and the judgments affirmed.