Jones et al. *v.* Monroe Electric Company, Appellant.

Argued May 25, 1944. Before MAXEY, C. J., DREW, LINN, STERN, PATTERSON, STEARNE and HUGHES, JJ.

reargument refused November 27, 1944.

*Thomas F. Gain,* with him *J. Perry Eckels, George C. McCarthy* and *Joseph J. Sullivan,* for appellant.

*Fred C. Kiebort,* with him *E. Lowry Humes,* of *Humes & Kiebort,* and *R. E. Blackwood,* for appellees.

OPINION BY MR. JUSTICE HUGHES, September 25, 1944:

On May 12, 1937, there was a severe electrical storm in the immediate vicinity of the plaintiffs' farm. During the storm the barn of the plaintiffs, with its contents, was totally destroyed by fire. The issue raised at the trial was whether the barn was fired through the negligence of the Monroe Electric Company, or by an Act of God. The defendant company constructed an electric line over the highway in front of the plaintiffs' barn and across a portion of the farm. It consisted of two wires running parallel. One was the hot or primary wire and the other was the neutral or secondary wire. One of the nearby poles on the trunk line system carried a transformer, and from this pole a service line was run to a lift pole, and then to the plaintiffs' barn. The barn had been wired for electric service, but there had not yet been a connection made between that wiring and the lines of the defendant company. The service line, terminating in three wires at the plaintiffs' barn, had been attached to the southwest corner of the barn and the ends of the wires hung about one foot from the point of attachment to the barn, near the place where the wiring system of the barn terminated. At the time of the occurrence of the electrical storm the wires of the system had not yet been energized. The plaintiffs claim the defendant was negligent in failing to properly ground the electric lines and transformers, so that in case of being struck by lightning it could be diverted into the earth, instead of being transmitted over the wires to the barn of the plaintiffs.

No one actually saw the lightning strike, but soon after it struck flames were observed from the corner of the barn to which the wires led, a few feet below the roof. That lightning struck the wires of the distribution system, immediately before the fire, between the transformers, was definitely established by its effect on the poles carrying the transformers, for the tops of both of

these poles were split and slivered. The evidence established that lightning having struck the distribution system, it followed the wires of the system instead of going to the ground, as it would have done if the system had been properly grounded. An expert witness, Peter L. Bellaschi, was asked: "Q. Mr. Bellaschi, if a line is struck over the countryside for a quarter of a mile or more, not energized or energized, either one, electrical currents created by lightning can get into that line, can't they? A. Correct. Q. If that line leads to or in the vicinity of a barn or a dwelling, the electrical currents which so get into the line can be conveyed into the dwelling, can't they? A. That's correct. Q. Will electricity jump a gap? A. Oh, yes. Q. How big? A. I mentioned as high as five million volts have been actually measured at the terminal. Five million volts easily jumps twenty-five feet." And James Melhuish, another expert, testified: "Q. Does the width of the gap make any difference? A. Yes, sir. Q. In what way? A. The greater the gap, the greater is the force to jump it, the greater the heat is. The same as in a combustion engine. It wouldn't run if there wasn't a gap. Q. If the energy is sufficient and the gap large enough, it will do what? A. Produce a flame." The plaintiffs' experts claimed that if the system had been properly and adequately grounded, the lightning which struck the wires would not have been carried to the barn, but would have been dissipated into the ground. There was sufficient evidence to justify the submission of the case to the jury on the question of the negligence of this defendant-contractor in failing to properly ground the wires at the transformers.

The appellant contends the case should not have been submitted to the jury because the evidence failed to exclude an inference that the barn had been directly struck by lightning. The evidence disclosed that the barn had a complete lightning rod system covering it, there being seven rods upon it. The witness who installed the wiring

system in the barn was asked: "Q. At the time you were making the installation on the premises, did you do anything in connection with those lightning rods or the lightning rod system? A. I observed it to see if it was in working condition. Q. Did you inspect them? A. Yes, sir. Q. Your inspection disclosed what? A. They were all in good condition. Q. Were they grounded? A. Yes. Q. Did you examine the ground? A. Yes. Q. In what manner was that grounded? A. By a clamp on the cable to the rod. Q. Where was the ground placed? A. At the corners. The ground rods, you mean? Q. The ground itself? A. In the ground. Q. Where? A. In the corner. Opposite corners." A witness who was inside the barn at the time the lightning struck, testified that he immediately went upstairs to the mow and discovered fire at the southwest corner of the barn at a point near where the service wires were attached to the barn. The barn was completely destroyed by fire. In *Lott et ux. v. Peoples Natural Gas Company*, 324 Pa. 517, 525, 188 A. 582, it was stated: "Defendant contends that, even granting plaintiffs' version of the cause of the accident to be tenable, there were other possible causes, and therefore the jury's verdict could have been founded only on a guess as to the actual cause. It is true that 'Where an injury may be the result of one of two or more causes, for only one of which defendant is liable, the burden is on plaintiff to individuate that one as the proximate cause of his damage, . . . otherwise there can be no recovery': *Gausman v. Pearson Co.*, 284 Pa. 348, 352; *King v. Equitable Gas Co.*, 307 Pa. 287, 294. However, 'It is not necessary for the plaintiff to exclude everything which the ingenuity of counsel may suggest as possibly causing or contributing to an accident': *Gallivan v. Wark Co.*, 288 Pa. 443, 456-7; *Kapuscianski v. Phila. & Reading C. & I. Co.*, 289 Pa. 388, 392; *Rozumailski v. Philadelphia Coca-Cola Bottling Co.*, 296 Pa. 114, 119." The evidence produced on behalf of the plaintiffs was sufficient to individuate the negligence of this defendant in failing to properly ground its wires and thus permitting a bolt

of lightning which struck the wires to carry along them and into the side of the barn at or near the point where the wires terminated and thereby set the barn on fire, as the proximate cause of the injury to the plaintiffs. The trial judge was required to submit the question of the defendant's negligence to the jury. "The test is whether the circumstances are such as to satisfy reasonable and well balanced minds that the accident resulted from the negligence of the defendant": *King et ux. v. Darlington Brick & Mining Co.*, 284 Pa. 277, 131 A. 241; *Mars v. Philadelphia Rapid Transit Co.*, 303 Pa. 80, 90, 154 A. 290.

Our case is distinguished from *Rocap v. Bell Telephone Company*, 230 Pa. 597, 79 A. 769, and *Sinkovich v. Bell Telephone Co. of Pennsylvania*, 286 Pa. 427, 133 A. 629, where it was held that in case of death caused by lightning carried along a telephone wire, the causal connection must be proved, not as a possibility, or as something that might have resulted, but the experts must testify, if recovery is to be allowed, that in their opinion the result in question did come from the cause alleged. The plaintiffs' expert in this case did testify: "In my opinion an atmospheric charge of electricity, lightning, was attracted to and collided with the distribution system referred to in the [hypothetical] question and was conducted along these wires and along the service wires from the transformer into the barn and set fire to the barn, which resulted in its destruction." And to the further hypothetical question as to whether the atmospheric electricity would have affected the barn in any way if the wires had been properly grounded, he stated: "In my opinion, this current—this electric current, lightning current of electricity—would have been conducted along the wires to the lightning arrestor and dissipated itself into the ground."

The appellant complains that the court submitted the wrong measure of damages to the jury, that he should have told them the proper measure of damages was the diminution in the market value of the plaintiffs' prop-

erty by the destruction of the barn and that the cost of replacing the barn was inadmissible. It was stated in *Durante et al. v. Alba*, 266 Pa. 444, 448, 109 A. 796: ". . . the trial judge incorrectly held the measure of damages to be the difference between the value of plaintiffs' property as it was with the building upon it and its value after the building fell. This is a necessary rule in cases of eminent domain, for not otherwise can be measured the extent of the consequential damages to which the owner is constitutionally entitled. It also applies where the realty, as distinguished from the structures upon it, has been permanently injured or destroyed; as, for instance, where riparian land has been partially washed away by changing the channel of a stream: *Shaffer v. Pennsylvania Company*, 265 Pa. 542; or springs of water upon the property have been destroyed, as in *Rabe v. Schoenberger Coal Company*, 213 Pa. 252, upon which the trial judge relied, wherein, however, the distinction referred to was made manifest when we said 'Other injuries, such as the sinking of the dwelling house . . . were remediable. For the latter, the cost of repair or restoration is obviously the measure of the damage.' In the present instance the only claim made is for 'totally wrecking and destroying the building.' Hence if enough thereof was left to justify its repair, at a cost not exceeding its value immediately prior to the injury, this would be the measure of plaintiffs' damage. Otherwise it would be the actual value of the building itself, taking into consideration its age, condition and any other circumstances affecting it, and less anything salvaged from it. Of course, in either case, damages for detention should be allowed if the facts justify them." The charge of the learned trial judge fairly submitted the measure of damages in accordance with the principles laid down in the foregoing decision and the verdict should not be disturbed.

We have examined the other assignments of error and find them to be without merit.

Judgments affirmed.