## First Methodist Episcopal Church v. Bangor Gas Co.

*E. G. Scoblionko,* for plaintiff.

*Clyde W. Teel* and *Everett Kent,* for defendants.

WOODRING, J., January 30, 1956.—Plaintiff instituted this action of trespass to recover damages which resulted from an explosion in the furnace of the church property. At the close of plaintiff's testimony the court entered a compulsory nonsuit. Plaintiff, thereupon, filed a motion to remove the nonsuit, which motion is now before the court.

In support of the motion to remove the nonsuit plaintiff assigned seven reasons and, after the testimony was transcribed, filed 19 additional reasons. At the argument, however, plaintiff has reduced his reasons to two in number:

"1. Did the learned trial judge err in failing to submit to the jury the question of Bangor Gas Company's liability in light of the testimony presented?

"2. Did the learned trial judge err in refusing expert and opinion testimony on the cause of the explosion?"

We will consider those two reasons. Throughout our consideration of plaintiff's motion to remove the nonsuit the evidence must be viewed in the light most favorable to plaintiff: Hanley v. Peoples Natural Gas Co., 325 Pa. 6, 188 Atl. 157.

Plaintiff owns and occupies a church building in the borough of Bangor. The heating plant is situate in the basement and consists of a boiler, an oil burner and a gas pilot. The oil burner is activated and controlled by the usual electrical devices including a thermostat, relays, solenoids, solenoid valves and certain safety devices variously referred to as a statcontrol, protectostat or pyrostat. The electrical devices also include electrodes which produce a spark to ignite the admixture of gas and air in the plot.

The gas pilot consists of a metal chamber into which air enters on one side and a gas on the other side. The

air and gas mix in this chamber and the admixture is then ignited by the electric spark produced by the electrodes. The resulting flame is projected into the fire box to ignite the oil fuel. Connected to the motor of the oil burner is a fan which propels the air into the mixing chamber. The gas is propelled into the mixing chamber by pressure maintained in the gas main and the service pipe. In order to control and limit the flow of gas into the mixing chamber the gas is conducted through a metal spud. A spud is a small cylindrical piece of metal open on one end and closed on the other end excepting for a small hole, called an orifice. The open end is threaded and attaches to the gas pipe. In other words, a spud merely reduces the space through which the gas flows from the area of a cross section of the gas pipe to the area of the orifice or small hole in the end of the spud.

Mr. Bruschi, the oil burner service man, and additional defendant, described the operation of the oil burner as follows: ". . . the thermostat calls for heat. There is an electrical connection in the thermostat will close. That in turn goes through a set of relays. One relay or solenoid will close. That will put on the electrodes, energize the electrodes, and open the gas valve . . . the motor of the burner comes on at the same time. . . . If the gas or the oil don't ignite, the protectorelay in the stack will cut the burner off entirely. That is the safety device." And, on cross-examination Bruschi testified, inter alia:

"A. Well, the protectorelay—the factory set that—when the one relay cuts in and ignites the ignition, ignites the electrodes opposite the gas valve and starts the motor of the burner, then there is a lapse of thirty seconds. That is factory set in that particular relay.

"Q. And that thirty seconds is what you call a purge relay?

"A. That is right.

"Q. Or purge period?

"A. Yes.

"Q. What happens is that the gas is thrown into the pilot, air is flowing to the pilot, the transformer is sending a spark to the ignition, and the blast of air is coming from the fan or motor through the combustion chamber, but no oil is coming in?

"A. That is right.

"Q. And, therefore, what did we mean by a purge period?

"A. To dispense with the gases that might be in the chamber.

"Q. Whatever fumes or air might be there is purged out, and purged where?

"A. Into the stack.

"Q. And up the chimney?

"A. Yes.

"Q. Now, you told yesterday what happens in this sequence when it burns, but now we are continuing with what happens when it doesn't burn. In ninety seconds, then, if no oil flame is established, the protectorelay cuts off everything?

"A. That is right."

Defendant is a public utility and supplies combustible gas to its customers in the Bangor area. One of those customers was plaintiff in this case. Prior to January 13, 1954, defendant had provided a propane air gas. Defendant proposed converting from propane air gas to natural gas as of 12:01 a.m., January 13, 1954. In preparation of said conversion to natural gas defendant made a survey of all its customers and the several applicances used by each customer. Postcard notices of the proposed conversion were mailed to the customers and an advertisement published in the local newspaper. On the night of January 12-13, defendant turned natural gas into their mains, and bled off the propane air gas by igniting bleeders which had been

installed at various points throughout defendant's system. All of the propane air gas was removed from the lines by 8 a.m., January 13th. On the morning of January 13, 1954, defendant, working through a corps of 25 "conversion men", turned off all automatic appliances in the Bangor area. One such conversion man called at plaintiff's property and adjusted the oven burners for the use of natural gas. Defendant, however, had no record of the gas pilot installation attached to the furnace.

Prior to January 13th, plaintiff's oil burner and heating plant had been operating satisfactorily. Plaintiff's sexton or custodian and some of the members of the board of trustees read defendant's advertisement in the Bangor Daily News which announced the conversion from propane air gas to natural gas. Some of the trustees had read the advertisement and others of them had read a news article and testified that they knew natural gas was going into the lines. At 4 p.m., on January 13, 1954, there was a small explosion or "puff" in the furnace of the church (no claim for damage is made for this incident). The sexton called Mr. Bruschi (additional defendant), the oil burner service man. Clyde Miller and another, employes of Bruschi, responded. There was evidence that the oil burner had been working well, but that after the first explosion, the burner men could not ignite the gas in the gas pilot. The witnesses testified that they knew they were getting gas because they could burn it in the combustion chamber, but it would not automatically ignite in the pilot. For this reason they sent for the conversion men.

At 9 or 9:30 p.m., January 13, 1954, the converter men withdrew the gas pilot, removed the spud from the gas line and reduced its orifice by peening the top of the spud and resizing it with a drill gauge. The spud, thus adjusted, was then returned to the gas

line. Following this adjustment the burner men and the converter men operated the burner which seemed to function properly. The gas pilot lit the fuel oil in the combustion chamber. Mr. Miller said it worked all right; they tried it a couple of times. Mr. Lobb testified that he watched the furnace work. It ignited the vapor oil four or five times, and it could have been more. The gas men left around 10:30, and Mr. Miller left around 11 p.m.

Several hours later, on January 14th, between 1:30 and 2 a.m., there was another explosion or blowback in the combustion chamber of the furnace. There is no testimony of any kind reflecting the condition of the oil burner or the pilot from the time the oil burner men left, about 11 p.m., January 13th, down to the time of trial. Mr. Bruschi, the oil burner man and additional defendant, had the oil burner in his custody until the date for trial. He also had the spud three or four weeks after the explosion, at which time the testimony indicates he gave it to an unidentified person, since which time it has not been located. The gas pilot was produced in court, without the spud, but there was no testimony nor suggestion that it was in any way improperly constructed, adjusted or maintained.

Plaintiff purports to base his claim of liability on five separate theories, set forth in paragraph 9 of the complaint:

"(a) In failing to make any preliminary survey to ascertain what precautions should be taken by defendant before converting the gas it supplied to plaintiff from manufactured gas to natural gas;

"(b) In failing to adjust the burner of the plaintiff corporation before converting its gas from manufactured gas to natural gas;

"(c) In undertaking to repair and adjust the boiler of the plaintiff using unskillful, unqualified and incompetent workmen;

"(d) In performing the adjustment and conversion in an unskillful and unworkmanlike manner;

"(e) In failing to take proper precautions for plaintiff's property in view of the dangerous instrumentality involved."

(a) Testimony on behalf of plaintiff established that defendant did make a preliminary survey which extended over a considerable period of time prior to instituting the act of converting from manufactured to natural gas. There was no testimony that the survey made and the plan of action adopted were in any way improperly conceived or performed.

(b) Testimony on behalf of plaintiff established that adjustment of the gas burning appliances of defendant's customers prior to conversion was impossible. A consideration of all of the testimony makes it apparent that plaintiff has not pursued the theory of liability set forth in its subparagraph (b).

(c) Likewise, plaintiff has not pursued the theory of liability set forth in subparagraph (c). None of the testimony indicates that defendant used unskilled or incompetent workmen, but rather that defendant employed a crew of specialist conversion men. In any event, there is no testimony that defendant did any act in the nature of repair or adjustment to plaintiff's *boiler*.[1] (The only act done by defendant's employes was to the spud in the pilot which can scarcely be considered as a part of the boiler).

(d) Plaintiff did rely on the theory of liability set forth in its subparagraph (d). That paragraph refers to the "peening and reaming of the orifice". We will discuss this theory of liability, infra.

(e) The theory of liability set forth in (e) is a general one, has not been pursued and we are not

---

[1] Italics supplied, throughout.

certain that it correctly reflects the law of Pennsylvania. This, too, will be discussed in our consideration of the law of the case.

It is the duty of a gas company to take proper care of its gas mains and pipes which are under its control, and the company is liable for any injuries resulting from the neglect of this duty: Hanley v. Peoples Gas Company, supra. In the case at bar the gas pilot was owned, installed and controlled by plaintiff. The gas was turned on and off automatically by a solenoid or magnetic tripping device contained in one of the relays which was an integral part of plaintiff's oil burner equipment. Plaintiff's testimony discloses that defendant had no knowledge of the existence of the gas pilot until after the introduction of natural gas into defendant's mains. Defendant, therefore, was under no duty to inspect or repair the gas pilot: Hanley v. Peoples Natural Gas Company, supra.

Mr. Justice Barnes speaking for the Supreme Court in the Hanley case, supra, said:

"Negligence on the part of the defendant cannot be presumed from the mere showing of an explosion or the happening of the accident. In order to recover plaintiff must produce competent evidence to show wherein defendant failed in its duty to plaintiff, and further that the breach of that duty was the cause of plaintiff's loss. As this Court stated in Greed v. Manufacturers' Light & Heat Co., supra (p. 251): 'In a case like this negligence is never presumed from the mere happening of an accident. He who alleges it must affirmatively prove it, or point to such circumstances as naturally and reasonably lead to the conclusion of carelessness on the part of the accused as the proximate cause of the occurrence which resulted in the injuries complained of'. In the case of Pouder v. People's Natural Gas Co., supra, as in Windish v.

People's Natural Gas Co., supra, there were the same questions involved as the one here before us. We said [248 Pa. 242] (p. 245) : 'It scarcely need be said that the doctrine res ipsa loquitur has no application to this case. There can be no recovery here unless the negligence charged was proved; the happening of the accident is not sufficient to make out a case'."

To the same effect is a statement by Mr. Justice Barnes in Conway v. Philadelphia Gas Works Co., 336 Pa. 11, 7 A. 2d 326:

"While a gas company is under a duty to exercise the highest degree of care in supplying the product to its customers, there can be no recovery in a case of this character unless there is clearly established some act of negligence on its part which results in injury to plaintiff. . . ."

In the case at bar the damage did not arise from a leak in the gas main which had been negligently maintained and over which defendant had control,[2] nor did the damage arise from a break in the service line which had been carelessly installed by defendant's workmen.[3] In fact, plaintiff's proof in nowise individuates the cause of the accident.[4] The explosion occurred in the combustion chamber of the oil burner, a device which although mechanically simple in itself is operated and controlled by complex and delicate electrical, magnetic and automatic devices.

The gas pilot on the other hand is an extremely uncomplicated device consisting of a metal chamber in which air and gas are mixed for combustion. Assuming that the chamber was cast in the proper design, it

---

[2] Lorenz v. Caste Development Co., 368 Pa. 131, 81 A. 2d 887.

[3] Heller v. Equitable Gas Co., 333 Pa. 433, 3 A. 2d 343.

[4] Foley v. The Pittsburgh-Des Moines Co., 363 Pa. 1, 68 A. 2d 517; Lott v. People's Natural Gas Co., 324 Pa. 517, 188 Atl. 582.

will continue to function in the absence of some actual mutilation or destruction. The supply of air is produced by a fan connected to the motor which operates the oil burner and over which defendant had no control. The supply of gas is insured by the pressure maintained in the gas mains and pipes. Plaintiff's testimony (exhibts 3, 4, 6 and 7) established that the pressure in defendant's system during the period of time in question was extremely uniform and there was an entire lack of evidence that the established pressure was improper or inadequate.

As has already been pointed out, the gas pilot was owned and controlled by plaintiff. Defendant had no knowledge of it and owed no duty of inspection or maintenance concerning it. On the evening of January 13th, when defendant was notified of the first explosion or blowback, its converter men did visit plaintiff's premises and reduced the orifice in the spud of the gas pilot. By that act defendant was obliged to make the adjustment in a careful workmanlike manner. The burden of proof that said adjustment was done otherwise was upon plaintiff. In our opinon there was a complete absence of proof of negligence. The submission of that question to the jury would have been an invitation to have the jury guess what caused the second explosion or blowback. The testimony on plaintiff's side established that natural gas is hotter or contains more B.T.U.'s than propane air gas. In other words, it requires less natural gas to perform the same service which would be required of propane air gas. In order to accommodate the gas burning device to the change from propane air to natural gas the witnesses testified that the jet or orifice in the spud should be reduced in size.

The testimony discloses that it is not unusual to adjust the orifice in a spud and that, in fact, spuds

are made by the manufacturers so that such adjustment can be made. They are manufactured of malleable [5] brass and there is on the market standard peening hammers and gauge drills of an infinite variety of sizes. In the case at bar plaintiff's testimony discloses that defendant's workmen had such a peening hammer and had a standard set of gauge drills. The converter men removed the spud from the pilot, peened the orifice, thereby reducing it in size, and then resized it with a gauging drill from the set of drills already described. There is no testimony that this was improper practice or that the simple operation had been done in an unworkmanlike manner. In fact, the testimony discloses that even if the gauging drill had been too large, the only harm which would have resulted would have been the burning of more gas than was necessary. It appears that the gauging drill was not too small because the testimony of all the witnesses establishes that after the spud was adjusted the oil burner system including the gas pilot, did operate satisfactorily and that it so operated on three or four or four or five occasions, "possibly more".

It is important to keep in mind that at no time was there any odor of leaking gas [6] nor any other evidence that the explosion or blowback resulted from the gas pilot rather than from the oil burner itself. Some of plaintiff's witnesses did testify that the explosion produced no oil smudges, but we are constrained to determine that such testimony, standing as it does by itself, is inadequate to convict defendant of negligence. In our opinion plaintiff has failed to individuate the

---

[5] Webster's New World Dictionary: "1. that can be hammered, pounded, or pressed into various shapes without breaking . . ." Syn. see pliable.

[6] Conway v. Philadelphia Gas Works Co., 336 Pa. 11, 7 A. 2d 326.

cause of the accident and has failed to prove the violation of any duty which defendant owed to plaintiff. Plaintiff endeavors to excuse his failure to prove negligence by invoking the doctrine of *exclusive control*.[7] Defendant, however, had no control over plaintiff's oil burner furnace and plaintiff, in order to recover, must prove defendant's violation of some duty.

Plaintiff objects to the court's refusal to permit Clyde Miller and Henry M. Shields to give expert opinions as to the cause of the explosion.

"Whether a particular question is such as calls for expert testimony, and whether the witness shows proper qualifications, are largely within the discretion of the trial court. If he decides opinion evidence is necessary and that the witness is qualified, the questions on review are whether the trial judge abused his discretion in so deciding, and whether the opinion received was admissible": Henry, Penna. Evidence, vol. 1, p. 561.

In proper cases an expert may give his opinion even though such opinion is the ultimate answer to the facts of the case: Foley v. Pittsburgh-Des Moines Co., supra; Walbert v. Trexler, 156 Pa. 112; Muller v. Kirschbaum Co., 298 Pa. 560; Ebbert v. Philadelphia Electric Co., 330 Pa. 257, 198 Atl. 323; Saganowich v. Hachikian, 348 Pa. 313, 35 A. 2d 343.

On the other hand, where there is no reasonable basis for an opinion, it is valueless and hence inadmissible. A witness will not be permitted to express a guess or to state a judgment based on mere conjecture: Marks v. Lumbermen's Insurance Co., 160 Pa. Superior Ct. 66, 49 A. 2d 855. In our opinion, no sufficient facts were established to justify the expression of an expert

---

[7] Mitchell v. Scharf, 179 Pa. Superior Ct. 220, 115 A. 2d 774; Shafer v. Lacock Hawthorn & Co., 168 Pa. 497; Kotal v. Goldberg, 375 Pa. 397, 100 A. 2d 630.

opinion as to the cause of the accident. Very apparently the explosion could have resulted from one of many factors or circumstances in and about the complicated oil burner system over which defendant had no control and about which it had no knowledge. In any event, the record discloses that Clyde Miller and Henry M. Shields were not qualified to give their opinion as to the ultimate answer.

Clyde Miller is an oil burner repairman. He has no knowledge of gas or gas burning devices and was not familiar with gas spuds or orifices. He did endeavor to guess that there was not the right mixture of air and gas in the pilot. There is no foundation for showing his ability to determine that or the manner in which he determined it in an expert sense. All that he knew was that the pilot would not light and that he had better send for the conversion men. After the conversion men adjusted the spud, the witness, Clyde Miller, testified that he saw the oil burner operate.

In the consideration of expert opinion by Clyde Miller and Henry M. Shields, the complete lack of facts and circumstances existent prior to the second explosion should be kept in mind. We do not know whether the gas pilot burned with a blue flame (the universally accepted lay test for proper air and gas mixture) or with a yellow flame, which would indicate an improper mixture. We do not know whether the flame of the gas pilot after adjustment was of a normal length or size or whether it was longer or shorter than usual. The testimony nowhere discloses what the normal gas and air requirements of the pilot are. Nor, as we have previously pointed out, does the record disclose that the uniform pressures maintained according to the records introduced into testimony by plaintiff were inadequate or improper pressures.

The same conclusion pertains to the case of the proposed expert Henry M. Shields. His experience includes a B.S. degree, teacher of chemistry and physics in secondary schools for seven years, and that he engaged in fuel analysis for American Radiator Company for 18 years. This work consisted of analysis and study of the various physical and chemical characteristics of different fuels including oil, gas and coal. Significantly, although having worked for American Radiator Company for 18 years, the witness had no knowledge of the various types of furnaces manufactured and sold by his employer company. The simple term "malleable brass" was designated by the witness as a *metallurgical term* and one with which he was not familiar. The witness was not qualified as a combustion engineer, knew none of the requirements and characteristics of plaintiff's furnace and conducted no tests or experiments with plaintiff's oil burner or the gas pilot. We feel it unnecessary to recount in detail the myriad facts with which the witness had no familiarity, experience or knowledge. Suffice it to say that the trial court did not abuse his discretion in refusing to permit this witness to give his expert opinion which, under the circumstances, would have been no more than a guess.

### Order

And now, this January 30, 1956, it is hereby adjudged, ordered and decreed that plaintiff's motion to show cause why the compulsory nonsuit heretofore entered should not be stricken from the record be and the same is denied and dismissed. The evidence taken at the trial is hereby certified and filed and made part of the record.