JOHN H. PHILLIPS, JR., and BEATRICE D. PHILLIPS, his wife, Plaintiffs—Below, v. DELAWARE POWER & LIGHT COMPANY, a Delaware corporation, Defendant and Third-Party Plaintiff—Below, Appellants, v. The MAYOR AND COUNCIL OF the CITY OF WILMINGTON, a municipal corporation, and Dabson Paving Company, a Delaware corporation, Defendants and Third-Party Defendants—Below, Appellees.

*(January 7, 1966)*

CAREY, Justice, and MARVEL and SHORT, Vice-Chancellors, sitting.

*Clement C. Wood,* of Allmond & Wood, for plaintiffs below, appellants.

*Roger Sanders,* of Prickett & Prickett, for defendant and third-party plaintiff below, appellant.

*Alfred M. Isaacs,* of Flanzer & Isaacs, for the Mayor and Council of City of Wilmington, appellee.

*William F. Taylor,* of Young, Conaway, Stargatt & Taylor, for

Dabson Paving Co., appellee.

Supreme Court of the State of Delaware, No. 20, 1965.

CAREY, Justice.

The action below was a suit in Superior Court for damages caused by an explosion of gas which came into plaintiffs' home from a gas main. The Court below granted summary judgment on the ground that the affidavits, depositions and other materials in the record failed, as against appellees, to show negligence or proximate cause. Plaintiffs and third-party plaintiff have appealed.

Plaintiffs (Phillips) originally sued Delaware Power and Light Company (Delaware) alone, since the gas came from Delaware's main in the bed of Twenty-seventh Street in Wilmington. Delaware filed a third-party complaint against the Mayor and Council of Wilmington (City) and Dabson Paving Company (Dabson) on the theory that certain resurfacing work that had previously been done on Twenty-seventh Street was performed negligently and was the cause of a break in the gas main, which it alleged was the true cause of the explosion. Thereafter, Phillips amended their complaint by adding both City and Dabson as defendants, charging negligence upon a theory similar to that in the third-party complaint.

The explosion occured in the middle of the month of January, and the repaving work had been done the preceding fall. The work was carried out by Dabson under a contract with City, which had provided the specifications. There were spots along Twenty-seventh Street which had previously given trouble to City because the earth under the pavement was apparently not sufficiently solid or firm to support the pavement. To prevent further trouble of this sort, the old paving and the sub-surface materials at those spots were removed to a depth of about eighteen inches, the holes filled with select gravel, and eight

inches of concrete poured on top of the gravel, thus making a "patch". After the patching, the whole street bed was covered with five inches of hard-mix asphalt, packed with a roller. The gas main here involved was three feet under the original surface. It was made of cast iron, eight inches in diameter. It had been in use about thirty-three years.

After the explosion, Delaware found a fresh break in the pipe from which gas was escaping, the break extending completely around the circumference of the pipe. The break was not directly under, but was near, a slab or patch laid by Dabson as described above. The evidence justifies a finding that the explosion resulted from gas escaping through this break, following the line of least resistance through the ground around the service line, and entering plaintiffs' home.

The vital question is whether there is any evidence in the record to justify a finding that the break in the main was caused by any act of the appellees.

The theory advanced by appellants is that the break was a "tension" break, caused either by the weight of the machinery used to patch the street surface, or by the weight of the slab laid. Two witnesses testified that this "could" be the correct explanation. Only one expert, however, was questioned as to the *probable* cause. This was Mr. Clift, an officer of Delaware. We quote the significant parts of his testimony:

"Q—Could that main have fractured because of cold weather?

A—Yes.

Q—It could have?

\* \* \* \* \* \*

Q—Then do you say that this piece of pipe broke because of force applied to it, applied to it from somewhere else and not being,

shall we say malleable or not bendable, that it just fractured?

A—It was a characteristic fracture of a cast iron main, let me just say that. We have many many cast iron mains break in our system, many of them; not very many of mains of this size, most of the mains that we have break are three-inch and four-inch mains which aren't physically as strong as this and this differed very little from the fractures of the mains that we dig up every year, find and dig up.

Q—What are the causes of these breaks that you have just been talking about, these fractures or breaks that you have just been talking about, some of the causes?

A—Well, you put your finger on one. Most of them occur during the winter when the frost level has gone down. The causes are probably brought about by ground stresses due to the frost and also the transmission of traffic shock due to the frost to the main, because cast iron mains are more susceptible to fracture because of shock than steel. That about covers the water-front on why it would break.

Q—This main was below the frost line?

A—I don't know the amount of frost that was in that ground at the time this occurred but my answer to that, I would say yes, that there wasn't frost down to the main at this point.

Q—There wasn't frost down to the main?

A—I don't believe there was.

Q—So we can't attribute this break to frost?

A—Let me say that you can have strain by frost without the frost encompassing the main.

Q—I don't quite understand that, maybe you could help me out?

A—Well, if you reduce the amount of cushion and I am speaking of earth, and replace it with a solid medium you are making the main more susceptible to shock. If a main has thirty inches of cover—I think this is three feet of cover, I think they have told me that is what it was—and we have a frost penetration of let's say two feet we have a cushion of one foot over the main and it makes it more susceptible to the shock that is brought about, and also susceptible to the strain.

So in my opinion it could have happened by frost or it could have happened because of the manner in which the repairs were made in the street."

\* \* \* \* \* \*

Q—Now, do you have any theory that the placing of the slab by the city of which we have just spoken some thirty feet to the east of the break in the main had anything to do whatever with the break?

A—I have read the report of the engineer who places the fault of the break on the slab and there is some merit in what he says that it could have imposed strains sufficient perhaps to break the main and it may have been a contributing factor; but having seen many breaks in the winter I would not say with any confidence that that is the reason that this main broke."

\* \* \* \* \* \*

It seems obvious to us that Mr. Clift's testimony at most means that the break was just as likely to have been caused by frost as by the slab or repair work. No expert witness has testified to anything more than the possibility—not probability—that the acts of appellees caused the break. Appellants point to the remark made by Mr. Clift indicating that some unnamed engineer had placed "the fault for the break on the slab." The statement must be ignored because we do not

have in the record any affidavit or deposition or even a report of this engineer. Any consideration by a Court of a motion for summary judgment is limited to the types of matters included within Superior Court Rule 56, *Del. C.* Ann., unless good reason has been given why affidavits cannot be presented. Counsel in this case were allowed more than ample opportunity to perfect their record, but saw fit not to introduce the unknown engineer's report or testimony.

Obviously, the present situation is one in which the assistance of experts is needed. As was said by Justice Stern in *Lott v. People's Natural Gas Co.*, 324 Pa. 517, 188 A. 582:

"A layman could not be expected to know or fully appreciate the laws of mechanics governing the problem involved. Questions as to the elastic limit of steel, the tensile strength of the pipe, the pressure that, in order to bend or break it, would have to be exerted at a given point by a given force acting in a given direction and at a certain distance, and the principles appertaining to leverage and fulcrums, are matters requiring technical knowledge and experience beyond the range of those who have not made them the subject of special study."

To the same effect are *Hardwick v. Kansas City Gas Co.*, 355 Mo. 100, 195 S.W. 2d 504, 166 A.L.R. 556 and *Empire State Ins. Co. of Watertown, N. Y. v. Guerriero*, 193 Md. 506, 69 A.2d 259.

The following language from *Jutras v. Satters, Inc.*, 96 N.H. 300, 75 A.2d 712 is pertinent:

"If a case cannot be decided intelligently by application to the evidence of common knowledge or such as results from the experience and the observation of the ordinary jury but requires technical knowledge that comes from special experience or training, then, in the absence of such technical knowledge, the plaintiff fails to establish a case. Otherwise the jury would be deciding the case on conjecture rather than reason."

See also 20 Am. Jur. 647; 2 Jones on Evidence (5th ed.) 834; 2

Harper and James, Law of Torts 1116; Prosser on Torts (3d ed.) 245.

There can be instances where, even though the experts are unable to give an opinion of probability, other evidence shows the likelihood of a given cause. *Cf. General Motors Corp. v. Freeman,* 3 Storey 74, 164 A.2d 686. No such evidence is pointed out to us in this case.

Citation of authority is unnecessary for the proposition that a plaintiff may not recover when he shows nothing more than mere possibility of causal connection between alleged wrongdoing and an injury; something more is required; yet that possibility is all that is shown by the record in this case. If the action were to be tried and no other testimony were then presented than is now before us, any finding of causation would necessarily be based upon speculation and conjecture. In short, the trial Court would be duty bound to direct a verdict in favor of appellees. The Court below was accordingly correct in entering summary judgment on the basis of the lack of evidence of causation. We need not, therefore, discuss the allegations of negligence against the appellees.

Appellants have raised a question concerning a statement in the lower Court's opinion which they interpret to mean that, on a motion for summary judgment, the burden is upon the resisting party in the first instance to produce proper evidentiary material sufficient to demonstrate the existance of a dispute of material fact. We think that appellants have misunderstood the Court's meaning. In several cases, we have made it plain that the moving party has the initial burden; he has the job of seeing that the record contains enough evidence to justify the granting of his motion. If he fails, the resisting party need not introduce anything into the record. But if the movant performs his initial job satisfactorily, then his opponent is obliged to bring in some evidence showing a dispute of material fact. *Cf. Ebersole v. Lowengrub,* 4 Storey 463, 180 A.2d 467. The Court below did not violate this rule. Its statements were simply a shorthand way of saying that appellees had enough in the record to justify thier motion, and, if appellants knew of evidence indicating the contrary, they should have produced it in a

manner recognized by the Rule.

 Appellants charge reversible error in that the Judge privately consulted three or four engineers as to some aspects of the case without informing counsel before making his decision. We have previously expressed our disapproval of this practice. *Barks v. Herzberg*, Del. 206 A.2d 507. Although the Judge's action was improper, it is presently immaterial because of the conclusion we have reached. Anything those engineers said to the Judge is not before us and has not been considered by us.

The judgment below must be affirmed.