**Louise BOGAR**

v.

**SPERRY RAND CORPORATION.**

**Civ. A. No. 79–1812.**

United States District Court,
E. D. Pennsylvania.

Nov. 21, 1980.

Edward J. Hughes, Norristown, Pa., for plaintiff.

James C. Sommar, Lansdale, Pa., for defendant.

## OPINION

JOSEPH S. LORD, III, Chief Judge.

The Findings of Fact which follow are based upon the testimony in court and my own on-site visual inspection of the premises.

### I. *Findings of Fact*

1. Louise Bogar, an individual and citizen of the Commonwealth of Pennsylvania, resides at 1621 Penllyn/Blue Bell Pike, Blue Bell, Pennsylvania, in Whitpain Township, Montgomery County. N.T. 207 & 242.

2. Sperry Rand Corporation (Sperry) is organized and exists under the laws of the State of Delaware and has its principal office at 1290 Avenue of the Americas, New York, New York. Petition for Removal, ¶ 1.

3. Bogar owns a 38.5 acre tract of land located at the intersection of Jolly Road and Township Line Road, Blue Bell, Pennsylvania in Montgomery County, on which she resides with her husband, Edward L. Bogar. N.T. 207.

4. Sperry owns a tract of land adjoining Bogar's land at Sperry's southeast boundary. The boundary common to the two tracts is approximately 1,900 feet long. Exs. P–1 & P–2.

5. Beginning in and about 1960 Sperry changed the topography of its land by constructing various buildings, including building 1–A, and parking lots on the land. Ex. P–1.

6. Before Sperry's land was developed by the construction, it was used as farm land. N.T. 210.

7. Sperry retained the Ballinger Company (Ballinger) as architects and engineers for the construction on Sperry's land. Ballinger proposed that Sperry construct a swale to capture surface water flowing from Sperry's land towards Bogar's land and to convey the water to Township Line Road. The swale would begin at or near

the boundary between Bogar's land and the property to the north, owned by Charles W. Barclay, and would continue from that point on Sperry's land to Township Line Road. N.T. 67, 283–84. Ex. P–1.

8. A swale is a man–made grass–covered depression designed and used for the conveyance of surface water from a higher point to a lower point. N.T. 59.

9. The proposed swale would have prevented any increase or concentration of surface water runoff from Sperry's land to Bogar's land. N.T. 281–82.

10. The proposed swale was never constructed by Sperry. N.T. 67.

11. Two swales have been constructed by Sperry near the Bogar property line. One is below a twenty–four inch pipe to the south of the parking lot built in 1973 and the other is in the area of the middle of Sperry's building 1–A. Both of these swales are designed to. capture and convey surface water from Sperry's land towards Bogar's land. N.T. 27, 111–13. Ex. P–2.

12. In 1973 Sperry constructed a parking lot on the portion of its land adjacent to the Barclay boundary and out to the Penllyn/Blue Bell Pike and to the Bogar boundary. The parking lot drained to the southeast–towards Bogar's land. N.T. 15–18. Ex. P–2.

13. In the 1973 construction the only measure Sperry took to control surface water runoff to Bogar's land was to install french drains. N.T. 114 & 115.

14. The project manager of the parking lot construction, Christopher L. Brooks, advised Sperry before installation that the french drains would be ineffective. N.T. 22.

15. The french drains installed by Sperry do not function to retard or control surface water runoff to Bogar's land except in moderate rains. N.T. 114, 195, 284.

16. The overall drainage area on Sperry's land contributing to surface water flow across the Sperry/Bogar boundary between points A and F on Ex. P–2 was decreased from 12.53 acres before construction to 7.71 acres as of March, 1979. N.T. 253 & 255.

17. Despite said decrease, the drainage area on Sperry's land contributing to surface flow across the Sperry/Bogar boundary between points D and E on Ex. P–2 was increased from 1.43 acres before construction to 3.00 acres as of March, 1979. N.T. 260.

18. (a) A two–year frequency storm is a storm precipitating 3.2 inches of rainfall during a twenty–four hour period which has a probability of occurring once every two years. N.T. 263.

(b) A ten–year frequency storm is a storm precipitating 5.0 inches of rainfall during a twenty–four hour period which has a probability of occurring once every ten years. N.T. 268.

(c) A one–hundred year frequency storm is a storm precipitating 7.3 inches of rainfall during a twenty–four hour period which has a probability of occurring once every one-hundred years. N.T. 77.

19. (a) The rate of surface water flow across the Sperry/Bogar boundary between the points A and F on Ex. P–2 during a two year frequency storm has been decreased by 38.8 cubic feet per second before construction to 19.9 cubic feet per second as of March, 1979. N.T. 263–64.

(b) Despite said decrease, the rate of surface water flow across the Sperry/Bogar boundary between points D and E on Ex. P–2 during a two year frequency storm has been increased from 5.3 cubic feet per second to 8.3 cubic feet per second. N.T. 266.

(c) The rate of surface water flow across the Sperry/Bogar boundary between points A and F on Ex. P–2 during ten and· one–hundred year frequency storms has been decreased overall but the rate between points D and E has been increased. N.T. 268.

20. The change in velocity of surface water runoff across the Sperry/Bogar

boundary line between points A and F on Ex. P–2 which occurred after construction is inconsequential. N.T. 270.

21. As a result of the construction, Sperry has unreasonably caused the concentration of surface water flow to Bogar's land in the area between points D and E on Ex. P–2. As a result Sperry has caused certain damage: the creation by erosion of a J–shaped ditch (J ditch) which is approximately 450 feet long, with an average depth of approximately two feet, and with an average width of 12.5 feet. The volume of the J ditch is approximately 417 cubic yards. N.T. 144, 145, 174, 184.

22. The cost of restoring the land by eliminating the J ditch is $5,768 and is computed as follows:

```
(a)  60 cubic yards top soil @ $15 .....  $ 900.00
(b)  357 cubic yard subsoil @  $10 .....   3570.00
(c)  16,875 sq. feet of lime and
     fertilizer @ $18 per thousand
     sq. feet ..........................    304.00
(d)  1,875 sq. yards seeding and
     mulching @ $.53 per sq. yard .....    994.00
                            TOTAL ....... $5768.00
```

N.T. 144, 145, 149, 150, 173, 177.

23. Before 1974 Bogar rented the land on which the J ditch is located to a farmer for a yearly rental of $100. The farmer stopped farming the land in 1974 because of the J ditch erosion. Bogar has not received the $100 per year rental since 1974. N.T. 227.

24. Bogar did not sustain her burden of proof as to any item of damages except those set forth in Findings of Fact 21, 22 and 23.

25. The highest and best use of Bogar's land is residential development. If so used it would have a fair market value of $385,-000. N.T. 87.

26. The surface water runoff from Sperry's land reduces the fair market value of Bogar's land at its highest and best use by $1,000 per acre. N.T. 88–89.

27. The J ditch itself does not reduce the fair market value of Bogar's land at its highest and best use. If the surface water runoff were reduced to pre–1960 levels there would be no reduction of fair market value to a developer. N.T. 90–91.

28. If the surface water runoff is not eliminated or reduced to pre–1960 levels, restoration of the J ditch land would be only a temporary aesthetic improvement. N.T. 119 & 125.

29. Boucher and James, the consulting engineers retained by Sperry with regard to the damage caused to Bogar's land, initially recommended that Sperry install a swale similar to that designed by Ballinger and depicted on Ex. P–1 to prevent any future erosion or surface water damage to Bogar's land. The present cost of construction of the swale would be $37,243. N.T. 185 & 281.

30. Boucher and James later proposed a less expensive alternative–construction of an earthern berm and extension of the present stone french drain trenches to spread the runoff more evenly across Bogar's land, thereby reducing it to the pre–1960 level. The cost of this alternative is $5,000. N.T. 278–79.

31. There are two other small ditches on Bogar's land–one south of the J ditch, the other near the Bogar/Barclay boundary. Neither was created by increased surface water runoff from Sperry's land. N.T. 273–74.

32. The construction on Sperry's land has not caused the loss of top soil on Bogar's land except in the area of the J ditch. N.T. 271.

II. *Discussion*

■ Mrs. Bogar clearly has a cause of action under Pennsylvania law for the damage to her land caused by Sperry's negligence. Sperry unreasonably concentrated the rate and amount of surface water flowing onto the Bogar property by failing to provide for effective drainage when developing its property. *Breiner v. C & P Home Builders, Inc.*, 398 F.Supp. 250 (E.D.Pa. 1975), *aff'd in part*, 536 F.2d 27 (3d Cir. 1976); *Westbury Realty Corp. v. Lancaster*

*Shopping Center, Inc.*, 396 Pa. 383, 152 A.2d 669 (1959); *Lucas v. Ford*, 363 Pa. 153, 69 A.2d 114 (1949). The runoff, though decreased in some areas of the Bogar/Sperry boundary, was increased in the area draining to the J ditch. That increase resulted in the creation and continuation of the ditch. Sperry argues that Bogar should recover no damages since the fair market value of her land at its highest and best use is not affected by the J ditch per se. As long as the drainage problem is corrected, the value of the land is undiminished. The *Breiner* case offers some support for Sperry's argument that the measure of damages is the diminution in value of the land at its highest and best use, or the cost of restoration, whichever is less. No Pennsylvania cases were cited by the *Breiner* court on this point however.

■ Pennsylvania distinguishes between permanent and remediable injuries to land in determining the applicable measure of damages. Where the injury is permanent the injured party recovers the depreciation in value caused by the injury. *Rabe v. Shoenberger Coal Co.*, 213 Pa. 252, 62 A. 854 (1906). Where injuries to realty are remediable "the cost of repair or restoration is obviously the measure of damages." *Id.* It is only where the cost of the repairs exceeds the value of the property before the injury that the measure of damages is the total value of the property. *Lobozzo v. Adam Eidemiller Inc.*, 437 Pa. 360, 263 A.2d 432 (1970); *Jones v. Monroe Electric Co.*, 350 Pa. 539, 39 A.2d 569 (1944). *Cf. Romesberg v. Caplan Iron & Steel Co.*, 385 Pa. 36, 122 A.2d 53 (1956) (same measure of damages applied to personal property).[1]

■ The damage to Bogar's land, creation of the J ditch, is clearly remediable. The cost of restoration, approximately $6,000, is much less than the fair market value of the land at its highest and best use

before the injury, $385,000. The Restatement (Second) of Torts § 929 (1979) also supports using the cost of restoration as a measure of damages in such case. Comment b to subsection 1(a) of § 929 states that the ordinary measure of damages for property used as the home of the owner is the cost of repairs even where the cost of repairs is greater than the total value of the property.

■ Bogar is also entitled to injunctive relief to prevent future erosion damage to her land caused by unreasonable runoff from Sperry's land. *St. Andrews Evangelical Lutheran Church v. Lower Providence Township*, 414 Pa. 40, 198 A.2d 860 (1964). There is no doubt that construction of a swale, like that proposed by Ballinger in 1960, will prevent future erosion.

Sperry argues, however, that the construction of a berm combined with extension of the french drains will resolve the problem. All three expert witnesses testified that french drains alone are ineffective in controlling runoff.

Given this evidence, I am reluctant to rely totally on the berm proposal to resolve the problem. I will instead order Sperry to build the berm on the condition that if the berm fails to reduce the runoff to the pre–1960 level, Sperry will construct a swale as proposed by Ballinger in 1960.

### III. *Conclusions of Law*

1. I have jurisdiction over the subject matter, 28 U.S.C. § 1332, and the parties and the amount in controversy is greater than $10,000 exclusive of interest and costs.

2. Pennsylvania law governs the substantive issues of liability in this action. *Erie R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

3. Defendant was negligent in causing or permitting increased water runoff from its land onto the Bogar land, as a result of which the Bogar property was damaged.

---

1. In *Art Club of Philadelphia v. Heyman & Goodman*, 325 Pa. 587, 190 A. 922 (1937), the Pennsylvania Supreme Court held that the injured plaintiff should recover the lesser of the cost of repairs to its building or the deprecia-

tion in value caused by the defendant. The *Lobozzo* Court strongly criticized the application of that measure as an inaccurate reading of *Rabe v. Shoenberger*, 213 Pa. at 252, 62 A. at 854.

4. Defendant is liable to plaintiff in the amount of $5,768 for the cost of restoring the J ditch on plaintiff's land, and in the amount of $500 for loss of rental income.

5. Bogar is also entitled to an injunction directing Sperry to reduce the surface water runoff to the pre–1960 level.